99 Cal.Rptr.2d 278 (2000)
24 Cal.4th 39
5 P.3d 839
In re Marriage of Candace PENDLETON and Barry I. FIREMAN.
Candace PENDLETON, Respondent,
v.
Barry I. FIREMAN, Appellant.
No. S070018.
Supreme Court of California.
August 21, 2000.
Rehearing Denied November 1, 2000.
*279 Lascher & Lascher, Wendy C. Lascher, Ventura; Wasser, Rosenson & Carter and John Foley, Los Angeles, for Appellant.
Kolodny & Anteau, Ronald W. Anteau, Peter Hermes, Beverly Hills, and James L. Keane, Los Angeles, for Respondent.
BAXTER, J.
We are asked to decide whether a premarital agreement in which the parties to be married waive the right to spousal support in case of dissolution is enforceable.[1] The Court of Appeal held that such agreements are enforceable. It is not necessary to decide in this case whether all such agreements are enforceable regardless of the circumstances of the parties at the time enforcement is sought. We conclude that no policy of this state makes an agreement like that entered into by the parties to this action per se unenforceable, and affirm the judgment of the Court of Appeal.

I

Background
Candace Pendleton and Barry I. Fireman married on July 13, 1991. On July 1, 1991, they had executed a premarital agreement which provided, inter alia: "[B]oth parties now and forever waive, in the event of a dissolution of the marriage, all rights to any type of spousal support or child support from the other; ..." The *280 agreement acknowledged that each party had been represented by independent counsel in the negotiation and preparation of the agreement, that counsel had advised each of the meaning and legal consequences of the agreement, and that each party had read and understood the agreement and its legal consequences. Their respective counsel certified that this had been done and that their clients understood the meaning and legal consequences of the agreement and executed it freely and voluntarily.
The couple separated in 1995, and on April 3, 1996, Candace filed a petition for dissolution of the marriage and subsequently sought spousal support. Candace acknowledged the existence of a premarital agreement in a declaration that accompanied her request for spousal support, stating that she was then investigating its validity. At the time the dissolution petition was filed, each party had a net worth of approximately $2.5 million. Candace, who had two children from a prior marriage, held a master's degree and was an aspiring writer. Barry, who held a doctorate in pharmacology and a law degree, was a businessman with ownership interests in numerous companies and business ventures. Candace declared that her monthly gross income was $5,772, consisting of $1,352 in Social Security benefits for two children from a prior marriage, $2,000 from a brokerage account, and $2,420 in rental income. Her net monthly income was $4,233.
Barry sought to strike the pleading seeking support or to have a separate trial on the validity of the prenuptial agreement. The court denied the motion for separate trial, concluding that discovery on the issue of validity would overlap that on other issues and would not result in saving time or litigation costs. The court ruled that the waiver of spousal support was against public policy and thus was unenforceable,[2] noted that the couple had maintained a lifestyle in the high $20,000 to $32,000 per month range, and ordered Barry to pay temporary spousal support of $8,500 per month.
On Barry's appeal, the Court of Appeal reversed the order for temporary spousal support. The Court of Appeal acknowledged that the Legislature had deleted subdivision (a)(4) from section 3, subdivision *281 (a)(4) of the Uniform Premarital Agreement Act (Uniform Act) prior to adopting the act in 1985.[3] The omitted subdivision would have expressly permitted the parties to a premarital agreement to contract with respect to modification or elimination of spousal support. (See 9B West's U. Laws Ann. (1987) U. Premarital Agreement Act, § 3 (1983) pp. 373-374.) The Court of Appeal concluded, however, that the Legislature intended to leave the question of whether spousal support waivers in premarital agreements violate public policy to the courts and that there was presently no authority governing the public policy question. In reaching the latter conclusion, the court reasoned that the question had not been reconsidered after the adoption of the Family Law Act of 1969 (Civ.Code, former § 4000 et seq.) which repealed the law permitting divorce only on a showing of fault, or in light of current law that gives both spouses equal control over management and control of community property (Fam.Code, §§ 1100-1103) and mandates equal division on dissolution (Fam.Code, § 2550). In the view of the Court of Appeal, the current state of family law is one that "should not per se prohibit premarital spousal support waivers or limitations. All the protection the parties need is expressly provided by the California [version of the Uniform] Act." The Court of Appeal therefore remanded the matter to the trial court which, in the belief that such waivers were per se unenforceable, had not determined whether this agreement was enforceable under the rules set forth in section 1615 and the policies underlying the Uniform Act and the California version thereof.[4]

II

Discussion
Article 2 of the California Uniform Premarital Agreement Act (§ 1610 et seq.) governs premarital agreements. A premarital agreement is "an agreement between prospective spouses made in contemplation of marriage and to be effective upon marriage." (§ 1610, subd. (a).) Section 1612 specifies the permissible objects of a premarital agreement:
"(a) Parties to a premarital agreement may contract with respect to all of the following:
"(1) The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located.
"(2) The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property.
"(3) The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event.
*282 "(4) The making of a will, trust, or other arrangement to carry out the provisions of the agreement.
"(5) The ownership rights in and disposition of the death benefit from a life insurance policy.
"(6) The choice of law governing the construction of the agreement.
"(7) Any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty.
"(b) The right of a child to support may not be adversely affected by a premarital agreement."
As noted, ante, the California version of the Uniform Act omits subdivision (a)(4) of section 3 of the Uniform Act (subdivision (a)(4)). When first introduced on March 7, 1985, Senate Bill No. 1143 (1985-1986 Reg. Sess.) (Senate Bill 1143), the California version of the Uniform Act, included subdivision (a)(4), and thus listed among the permissible subjects of a premarital agreement "the modification or elimination of spousal support." The spousal support waiver provision was deleted by amendment. (Assem. Amend. to Sen. Bill No. 1143 (1985-1986 Reg. Sess.) Aug. 28,1985.) The amendment of Senate Bill 1143 that deleted subdivision (a)(4) simultaneously deleted a provision in subdivision (b) of section 3 of the Uniform Act, which provided: "If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility." (Sen. Bill No. 1143 (1985-1986 Reg. Sess.) Mar. 7, 1985; Assem. Amend, to Sen. Bill No. 1143 (1985-1986 Reg. Sess.) Aug. 28, 1985.) As enacted, Senate Bill 1143 became Civil Code former section 5315, now Family Code section 1612.
The Court of Appeal held that neither the Legislature's deletion from the legislation of express authorization for premarital waivers of spousal support, nor past cases refusing to enforce waivers of spousal support, preclude such waivers today. The court reasoned that the legislative history of section 1612 suggested that, in omitting subdivision (a)(4) of the Uniform Act, the Legislature intended to leave the enforceability of spousal support waivers to the courts. It found support for that conclusion in two reports by the Assembly Subcommittee on Administration of Justice. The first was prepared for an August 19, 1985, hearing on Senate Bill 1143. Senate Bill 1143 repealed prior statutory law governing premarital agreements and enacted the Uniform Act. In the first report staff advised that California courts did not permit enforcement of premarital agreements on spousal support and recommended deletion "to allow California case law to continue to prevail on the issue of spousal support in premarital agreements." (Assem. Subcom. on Admin, of Justice, Rep. on Sen. Bill No. 1143 (1985-1986 Reg. Sess.) for Aug. 19, 1985, hearing, p. 3.)
The second report, prepared after the amendment passed, stated that as a result of the amendment "California case law would ... prevail on the issue of spousal support in premarital agreements, [¶] There is a split in authority among the states as to whether a premarital agreement may control on the issue of spousal support. Some states, such as California, do not permit a premarital agreement to control this issue. See In re Marriage of Dawley, 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323 (1976), in which the court notes that the enforcement of provisions in premarital contracts to waive or limit spousal support rights is barred because such provisions are considered promotive of divorce." (Assem. Subcom. on Admin, of Justice, Rep. on Sen. Bill No. 1143 (1985-1986 Reg.Sess.) as amended Aug. 28, 1985, p. 3.) The Court of Appeal understood this history to mean that the Legislature recognized *283 that enforceability of spousal support waivers is a question for the courts, not the Legislature.
At the time the California version of the Uniform Act was adopted, this court had held that agreements waiving the right to spousal support were unenforceable as being against public policy if the waiver would promote or encourage dissolution. This court had held in In re Marriage of Higgason (1973) 10 Cal.3d 476, 485, 110 Cal.Rptr. 897, 516 P.2d 289 (Higgason), speaking of both spousal support and property division, that to be valid, premarital agreements must be made "in contemplation that the marriage relation will continue until the parties are separated by death. Contracts which facilitate divorce or separation by providing for a settlement only in the event of such an occurrence are void as against public policy. [Citations.] [¶] Insofar as an antenuptial agreement relates to the disposition of the property of the respective parties, and does not seek to alter support obligations imposed by law, it will be upheld." At issue in Higgason was an agreement in which both husband and wife waived all interest in the property of the other party as well as the right to support. The court concluded that a purported waiver was invalid as against public policy insofar as the agreement sought to alter the wife's statutory obligation to support the husband during marriage. The court also held that the agreement did not preclude exercise of the court's discretionary power to award postdissolution support. (10 Cal.3d at pp. 487-488, 110 Cal.Rptr. 897, 516 P.2d 289.) Although the basis for the latter holding is not made clear in the opinion, it appears to be that married persons assume, by means of the marriage contract, an obligation for support that continues throughout the lifetime of the parties regardless of whether they live together or apart, and any agreement to waive that obligation is also unenforceable.
When the issue of enforceability of premarital agreements next arose in In re Marriage of Dawley (1976) 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323 (Dawley), where the parties had agreed before marriage that the earnings and property acquired during marriage would be held as separate property, the court concluded that Higgason had misstated the law in stating that premarital agreements must be made in contemplation that the marriage would continue throughout the lifetime of the parties and disapproved that Higgason dictum. (Dawley, at p. 352, 131 Cal.Rptr. 3, 551 P.2d 323.) We also explained that, apart from Higgason, "California courts have uniformly held that contracts offend the state policy favoring marriage only" if, objectively viewed, by its terms the contract promotes dissolution of marriage. (Dawley, at p. 350, 131 Cal.Rptr. 3, 551 P.2d 323.) We noted in Dawley that in two cases (Barham v. Barham (1949) 33 Cal.2d 416, 202 P.2d 289; and Whiting v. Whiting (1923) 62 Cal.App. 157, 216 P. 92) provisions in agreements that waived or limited spousal support rights had been invalidated on the basis that they promoted divorce, while other provisions containing property divisions were enforced; but Dawley did not endorse or otherwise approve those decisions. (Dawley, supra, 17 Cal.3d at p. 351, 131 Cal.Rptr. 3, 551 P.2d 323.) Notably, in Dawley we did not distinguish premarital agreements governing property rights and those governing spousal support. Our discussion of the enforceability of premarital agreements in no way suggested that spousal support waivers were per se unenforceable. The rule we stated was: "[A]n antenuptial agreement violates the state policy favoring marriage only insofar as its terms encourage or promote dissolution." (Id. at p. 352, 131 Cal.Rptr. 3, 551 P.2d 323.)[5]
*284 The parties have not called our attention to any legislative history other than the two legislative reports, the latter of which did not accurately state the holding of this court in Dawley,[6] and neither of which adequately explains the legislative purpose in omitting subdivision (a)(4). Two possible interpretations of the Legislature's intent in omitting express authority for premarital waivers of spousal support come to mind. The Legislature may have intended to deny couples the right to enter into any premarital agreement regarding spousal support by adopting what the committee report erroneously described as the existing case law under which premarital waivers would be per se unenforceable. Alternatively, the Legislature may have concluded that policy governing spousal support agreements, having been established by the court in the past, should continue to evolve in the court.
The public policy under which waivers of spousal support once were held unenforceable was explained in Loveren v. Loveren (1895) 106 Cal. 509, 512, 39 P. 801, quoting Phillips v. Thorp (1883) 10 Or. 494, 496-497: "`The authorities are uniform in holding that any contract between the parties having for its object the dissolution of the marriage contract, or facilitating that result, such as an agreement by the defendant in a pending action for divorce to withdraw his or her opposition and to make no defense, is void as contra bonos mores'; and that courts `will esteem it their duty to interfere, upon their own motion, whenever it appears the dissolution is sought to be effected by the connivance or collusion of the parties.'"[7] (See also Pereira v. Pereira (1909) 156 Cal. 1, 5, 103 P. 488.) Another concern was that a man should not be able to contract before marriage against the liability to his wife that he would incur should he commit offenses against the wife during the marriage. (See Barham v. Barham, supra, 33 Cal.2d at p. 428, 202 P.2d 289.) The rule those decisions implemented found its origin in the common law, but the policy had been declared by the Legislature in 1872 with the adoption of the Civil Code. Former section 159 of the Civil Code then provided: "A husband and wife cannot, by any contract with each other, alter their legal relations, except as to property, and except that they may agree to an immediate separation, and may make provision *285 for the support of either of them and of their children during such separation."[8]
Barry suggests, and we agree, that changes in the law governing the spousal relation warrant reexamination of the assumptions and policy underlying the refusal to enforce waivers of spousal support. We may not do so, however, if the Legislature intends that section 1612 control the permissible subjects of a premarital agreement and that public policy with respect to waiver of spousal support no longer be governed by the common law subject to reconsideration and development by the courts. (Cf. Rodriguez v. Bethlehem Steel Corp. (1974) 12 Cal.3d 382, 394, 115 Cal. Rptr. 765, 525 P.2d 669.)
It is clear that the Legislature understood that the omission of authorization for premarital waivers of spousal support in section 1612 would leave the law as it was in 1985. The subcommittee reports reflect that understanding. We do not agree with respondent and the dissent, however, that in so doing the Legislature thereby abrogated the role of the courts in developing the law governing premarital waivers of spousal support. We will not presume that the Legislature intended that the law remain static. It would be unreasonable to assume that the Legislature intended the common law of the 19th century to govern the marital relationship in the 21st century. The most reasonable understanding of the Legislature's purpose when it omitted subdivision (a)(4) is that it was satisfied with the evolution of the common law governing premarital waivers of spousal support and intended to permit that evolution to continue. Had the Legislature intended to forbid spousal support waivers, it is logical to assume that it would have done so by expressly including spousal support in subdivision (b) of section 1612, which reads: "The right of a child to support may not be adversely affected by a premarital agreement." We agree with the Court of Appeal, therefore, that the court is free to reexamine the assumptions that underlie the common law rule that premarital spousal support waivers promote dissolution and for that reason contravene public policy. Having done so, we also agree with the Court of Appeal that the common law policy, based on assumptions that dissolution of marriage is contrary to public policy and that premarital waivers of spousal support may promote dissolution, is anachronistic.
Some 41 jurisdictions have already abandoned the common law restrictions on premarital waivers of spousal support. In 21 jurisdictions, premarital waivers of spousal support are authorized by statutes that either adopt all or substantially all of the provisions of the Uniform Act.[9] One jurisdiction (New York) had other statutory authorization for such waivers,[10] and in another 18 the right to enforce a premarital waiver of spousal support exists pursuant to judicial decision.[11]
*286 The changes in public policy and the attitude toward marriage, already reflected in Dawley, supra, 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323, are made manifest by contrasting the current statutory treatment of marriage and premarital agreements with an early decision of the Oregon Supreme Court that reflects the 19th century view of public policy regarding marriage. "The welfare of society is so deeply interested in the preservation of the marriage relation, and so fraught with evil is regarded whatever is calculated to impair its usefulness, or designed to terminate it, that it has long been the settled policy of the law to guard and maintain it with a watchful vigilance. Although marriage, in the eye of the law, is a civil contract, unlike any other civil contract, it cannot be rescinded or annulled by consent of the parties to it. By mutual consent, if the parties are of the proper age and capacity, the marriage relation may be created and receive the sanction of the law, but it cannot dissolve or terminate it. That high office can only be performed by a court of competent jurisdiction, for some specified cause prescribed by law, upon proof taken in a suit for that purpose. The good order and well being of society, as well as the laws of this state, require this. And so strict and careful are courts in the administration of this justice, out of regard for the public morals and the general welfare of society, that they will esteem it their duty to interfere upon their own motions whenever it appears the dissolution is sought to be effected by the *287 connivance or collusion of the parties; and all contrivances or agreements, having for their object the termination of the marriage contract, or designed to facilitate or procure it, will be declared illegal and void as against public policy.... `... And when the marriage relation has been assumed, it is equally the policy of the law to sustain and uphold it. It, therefore, holds all contracts void which contemplate or provide for the future separation of the parties (Phillips v. Thorp, supra, 10 Or. at pp. 495-496 [1883 WL 1110].)
California statutory law of the time reflected these policies and values. In 1872, divorce could be granted only on the grounds of adultery, extreme cruelty, willful desertion, willful neglect, habitual intemperance, or conviction of a felony, and could be denied on grounds, inter alia, of connivance or collusion  the "corrupt consent" by one party to the other's commission of an act constituting cause for divorce or an agreement between the parties that one should commit, appear to commit, or represent to the court that one had committed such an act. (Civ.Code, former §§ 92, 111-114.) The husband had exclusive control of the community property with "absolute power of disposition (other than testamentary) as he ha[d] of his separate estate" (Civ.Code, former § 172) and a wife could not contract for the payment of money. (Civ.Code, former § 167.) The court was empowered to order the husband to pay alimony on divorce if the divorce was granted for an offense of the husband (Civ.Code, former § 139), but had no power to order a wife to pay alimony.
The assumptions underlying the refusal to enforce premarital waivers of spousal support were that the state had a vital interest in and should act to ensure the permanency of the marriage relation (Pereira v. Pereira, supra, 156 Cal. at p. 5, 103 P. 488), and that this interest was undermined by such waivers, assumptions reflected in statutory law governing marriage, dissolution, and property rights. In Dawley, supra, 17 Cal.3d at page 353, 131 Cal.Rptr. 3, 551 P.2d 323, however, we emphasized that only agreements that, on their face, promote dissolution violate the public policy favoring marriage. We recognized there that contemporary attitudes toward the marriage relationship are more pragmatic: "In recent years, however, an increasing number of couples have executed antenuptial agreements in order to structure their legal relationship in a manner more suited to their needs and values. (See generally, Weitzman, Legal Regulation of Marriage: Tradition and Change (1974) 62 Cal.L.Rev. 1169.) Neither the reordering of property rights to fit the needs and desires of the couple, nor realistic planning that takes account of the possibility of dissolution, offends the public policy favoring and protecting marriage. It is only when the terms of an agreement go furtherwhen they promote and encourage dissolution, and thereby threaten to induce the destruction of a marriage that might otherwise endurethat such terms offend public policy." (Dawley, supra, 17 Cal.3d at p. 358, 131 Cal.Rptr. 3, 551 P.2d 323.)
Both public attitude and contemporary official policy have changed substantially over the past century. Public policy continues to favor and encourage marriage, but it now acknowledges that lifetime commitment is no longer the norm. When legitimate grounds for dissolution exist, dissolution does not contravene public policy, but is the preferred solution. (Glickman v. Collins (1975) 13 Cal.3d 852, 858-859, 120 Cal.Rptr. 76, 533 P.2d 204.) The adoption of the California Uniform Premarital Agreement Act itself reflects recognition that permanency is no longer a dominant characteristic of modern marriage. The Family Law Act of 1969 (Civ. Code, former § 4000 et seq.) permitted, and now the Family Code permits, no-fault dissolution. (§ 2310.) A stipulation governing division of community property, once held in reliance on Phillips v. Thorp, supra, 10 Or. 494, to be collusive and to violate public policy (Loveren v. Loveren, supra, 106 Cal. at p. 512, 39 P. 801), today *288 is expressly allowed (§§ 2550, 2554), encouraged, and no longer condemned as facilitating dissolution. (Dawley, supra, 17 Cal.3d at p. 350, fn. 5, 131 Cal.Rptr. 3, 551 P.2d 323.) Spouses who are separated have long been permitted to contract with regard to division of property and to include provisions for spousal support on dissolution, even when community property was evenly divided and thus the division was not consideration for the modification of spousal support rights. (Dexter v. Dexter (1954) 42 Cal.2d 36, 43-44, 265 P.2d 873.) The right of husband and wife to agree in writing to separate and provide for spousal support both during separation and on dissolution of the marriage continues to be expressly recognized by statute. (§ 3580.)
Legal recognition also has been given to the changing position of married women who, in increasing numbers, are employed outside the home and have been given equal right to management of the property of the community as well as primary right to manage a business a wife is operating. (§ 1100.) Public policy toward spousal support has also changed. While spouses must support each other during marriage (§ 4300), the court has been given greater discretion in marital dissolutions to deny spousal support altogether or to limit such support in an amount and duration that reflects the ability of both parties in contemporary unions to provide for their own needs. (§§ 4330, 4320.) The changing attitudes are reflected in the 1969 repeal of former section 139 of the Civil Code (enacted 1872), which authorized the court to award lifetime support if a divorce was based on an offense of the husband. (Stats.1969, ch. 1608, § 3, p. 3313.) The underlying theory, we explained was then "`that the husband entered upon an obligation which bound him to support his wife during the period of their joint lives, that by his own wrong he has forced her to sever the relation which enabled her to compel the performance of this duty, and that he is required to make compensation for the offense committed by him which has deprived her of the benefit of the obligation.' (Arnold v. Arnold [(1946)] 76 Cal.App.2d 877, 885-886 [174 P.2d 674].)" (Webber v. Webber (1948) 33 Cal.2d 153, 157-158, 199 P.2d 934.) Today, however, a court ordering spousal support must consider, inter alia, "[t]he goal that the supported party shall be self-supporting within a reasonable period of time." (§ 4320, subd. (k).) The law has thus progressed from a rule that entitled some women to lifelong alimony as a condition of the marital contract of support to one that entitles either spouse to postdissolution support for only so long as necessary to become self-supporting.
These changes in the relationship between spouses and support obligations in particular, accurately described by the Court of Appeal as "dramatic" and by a legal commentator change" (Ellman, The Theory of Alimony (1989) 77 Cal.L.Rev. 1, 7), clearly warrant reassessment of what remains of the rule that premarital waivers of spousal support may promote dissolution and, if they do so, are unenforceable. Public policy, to the extent that it is reflected in these legislative acts, no longer reflects concern that premarital waivers of property rights threaten the marriage relationship. Section 1612 expressly permits the parties to contract with regard to numerous property rights, including "[t]he disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event." (§ 1612, subd. (a)(3).) No basis appears on which to distinguish premarital waivers of spousal support from agreements governing property rights insofar as either has a potential for promoting dissolution. As the Court of Appeal recognized, today the availability of an enforceable premarital agreement "may in fact encourage rather than discourage marriage." We agree with the Court of Appeal, therefore, that, when entered into voluntarily by parties who are aware of the effect of the agreement, a premarital waiver of spousal support does not offend contemporary *289 public policy. Such agreements are, therefore, permitted under section 1612, subdivision (a)(7), which authorizes the parties to contract in a premarital agreement regarding "[a]ny other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty."
We need not decide here whether circumstances existing at the time enforcement of a waiver of spousal support is sought might make enforcement unjust.[12] It is enough to conclude here that no public policy is violated by permitting enforcement of a waiver of spousal support executed by intelligent, well-educated persons, each of whom appears to be self-sufficient in property and earning ability, and both of whom have the advice of counsel regarding their rights and obligations as marital partners at the time they execute the waiver. Such a waiver does not violate public policy and is not per se unenforceable as the trial court believed.

III

Disposition
The judgment of the Court of Appeal is affirmed.
WERDEGAR, J., CHIN, J., BROWN, J., and HASTINGS, J.[*], concur.
Concurring Opinion by MOSK, Acting C.J.
I concur in the result.
The relevant statute provides that premarital agreements may concern any subject that does not violate public policy or a statute imposing a criminal penalty. (Fam.Code, § 1612, subd. (a)(7).) When a statute's words are "clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it." (Diamond Multimedia Systems, Inc. v. Superior Court (1999) 19 Cal.4th 1036, 1047, 80 Cal.Rptr.2d 828, 968 P.2d 539.) That is true here. Any lingering question whether the Legislature intended to omit premarital spousal support agreements from the scope of Family Code section 1612 is dispelled by subdivision (b), which prohibits premarital agreements to waive or reduce child support. Had the Legislature desired to prohibit spousal support agreements, it could have added a few words similar to those of subdivision (b).
Clearly, the parties did not conspire to violate the criminal law. The only question is whether their premarital agreement violated public policy. I agree with the majority that it did not.
Dissenting Opinion by KENNARD, J. I dissent.
In In re Marriage of Higgason (1973) 10 Cal.3d 476, 110 Cal.Rptr. 897, 516 P.2d 289, this court unanimously held that premarital agreements waiving spousal support in the event of separation or dissolution of the marriage violate California's public policy and are therefore invalid, leaving it to the trial court to determine at the time of separation or dissolution whether to award spousal support. Three years later, in In re Marriage of Dawley (1976) 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323, this court, again unanimously, came to the same conclusion. Our Legislature was fully aware of these decisions when in 1985, in adopting provisions of the Uniform Premarital Agreement Act, it chose to omit the act's provision allowing premarital waiver of spousal support, thus affirming the decisional law of this state that such waivers violate public policy.
*290 In overruling by judicial fiat the Legislature's decision to continue this state's prohibition against premarital waivers of spousal support, the majority has (1) invaded the legislative domain, (2) invalidated a legislative decision reflecting sound public policy, and (3) failed to articulate an intelligible standard to guide members of the bench and bar in determining whether a premarital waiver of spousal support is or will be enforceable.
I cannot and do not join the majority in its usurpation of legislative powers. Any change in the law at issue should come from the Legislature, not the judiciary.

I
California statutory law generally imposes an obligation to support one's spouse. (Fam.Code, § 4300 et seq.)
In 1985, California became one of the first states to adopt provisions of the Uniform Premarital Agreement Act. (9B West's U. Laws Ann. (1987) U. Premarital Agreement Act (1983) p. 369.) Uniform acts are drafted by the National Conference of Commissioners on Uniform State Laws "to promote uniformity in state law, on all subjects where uniformity is desirable and practicable, by voluntary action of each state government." (Id. at p. III.)
On March 7, 1985, Senate Bill No. 1143 (1985-1986 Reg. Sess.) was introduced in our Legislature. The bill proposed adopting the Uniform Premarital Agreement Act in its entirety. On August 28, 1985, however, the bill was amended to delete these two provisions of the act:
Section 3, subdivision (a)(4), allowing spousal support to be modified or eliminated through premarital agreements (Assem. Amend, to Sen. Bill No. 1143 (1985-1986 Reg. Sess.) Aug. 28, 1985),[1] and
Section 6, subdivision (b), providing that if, as a result of having entered into an a premarital agreement waiving spousal support, a spouse at the time of separation or marital dissolution becomes impoverished and eligible for public assistance, then a court retains the authority to award support "to the extent necessary to avoid that eligibility" (Assem. Amend, to Sen. Bill No. 1143 (1985-1986 Reg. Sess.) Aug. 28, 1985).[2]
When the Legislature deleted these two provisions from Senate Bill No. 1143, two decisions of this court, In re Marriage of Higgason, supra, 10 Cal.3d 476, 110 Cal. Rptr. 897, 516 P.2d 289, and In re Marriage of Dawley, supra, 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323, had held roughly a decade earlier that premarital agreements waiving spousal support violated California's public policy and were therefore *291 invalid. At the time of the deletion and until today's decision by the majority, it was the trial court that determined whether to award spousal support, depending on the circumstances existing at the time of separation or dissolution of the marriage. (See Fam.Code, § 4320 [circumstances trial court should consider in awarding spousal support].)
Does the Legislature's deletion of the provision allowing premarital waivers of spousal support establish its intent to preclude such waivers? The answer is "yes," as I explain below.
On point is this court's decision in Kusior v. Silver (1960) 54 Cal.2d 603, 7 Cal. Rptr. 129, 354 P.2d 657 (Kusior). There, as here, the Legislature was considering the adoption of a uniform act. There, the Legislature had refused to enact into law a provision of the Uniform Act on Blood Tests to Determine Paternity allowing blood tests to show that the husband was not the father of the child. (Kusior, supra, at p. 618, 7 Cal.Rptr. 129, 354 P.2d 657.) There, as here, California decisional law was contrary to the proposed provision.
This court in Kusior observed that "[s]tatutes are to be interpreted by assuming that the Legislature was aware of the existing judicial decisions." (Kusior, supra, 54 Cal.2d at p. 618, 7 Cal.Rptr. 129, 354 P.2d 657.) We then held that in omitting from its adoption of the uniform act at issue a provision directly at odds with this state's decisional law, the Legislature's omission "must be deemed" an intent to approve and retain the decisional law. (Ibid.) Similarly, here the Legislature's express rejection of the Uniform Premarital Agreement Act's provision allowing premarital spousal support waivers, in the face of decisional law to the contrary, "must be deemed" an intent to approve and retain the existing law. (See also Estate of Sanders (1992) 2 Cal.App.4th 462, 473-474, 3 Cal.Rptr.2d 536 [`"[t]he rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision'"].)
This court's decision in Kusior, supra, 54 Cal.2d 603, 7 Cal.Rptr. 129, 354 P.2d 657, is dispositive here. Under the reasoning of that decision, our Legislature's express rejection of the proposed uniform law provision allowing waivers of spousal support was a decision to approve and retain California's rule prohibiting such waivers. By now deciding that premarital spousal support waivers do not violate California's public policy, the majority has invaded the legislative domain, judicially enacting in substance a provision that the Legislature intended to reject, and judicially abrogating the rule that the Legislature intended to retain.

II
Our Legislature's decision not to enact into law the Uniform Premarital Agreement Act's provision allowing premarital waivers of spousal support, while adopting other provisions of the act, reflects sound public policy.
Such waivers do not allow for changed circumstances between execution of the premarital agreement and separation or dissolution of the marriage. An agreement equitable at the time of the marriage may later become inequitable and unjust. For example, the health, earning capacity, or financial resources of a spouse may change markedly during the marriage, especially one that is lengthy. An elderly spouse or one in poor health may be left destitute. The earning capacity of a spouse may be impaired by the obligations of caring for children produced by a marriage of short duration. After the marriage one spouse may elect to give up his or her career to raise the children of the marriage or to move to another location in the interest of furthering the career of the other spouse. And a spouse may substantially deplete his or her financial resources *292 to advance the other spouse's education, training, or career during the marriage.[3]
These considerations are reflected in the Legislature's enactment of Family Code section 4320, which sets forth spousal support guidelines for the trial courts.[4] They are also reflected in the Legislature's express declarations that spousal support is a "serious legal obligation[ ]" (Fam. Code, § 4250, subd. (a)) and that it "is the policy of the State of California" to "ensure fair and sufficient" spousal support awards (id., § 2100, subd. (a)). In rejecting the proposed provision to allow premarital waivers of spousal support, the Legislature must have recognized the serious potential for injustice at the time of dissolution of marriage.
That concern was succinctly expressed in a letter the Women Lawyers' Association of Los Angeles wrote on June 6, 1985 to Elihu Harris, the Chair of the Assembly Judiciary Committee, stating its opposition *293 to that part of Senate Bill No. 1143 proposing adoption of the Uniform Premarital Agreement Act's provision allowing premarital waivers of spousal support: "The bill would change existing California law, which does not enforce premarital waivers of spousal support, to allow such waivers under certain conditions. Current California law allows spouses to waive spousal support only at the time of separation, when they are much more aware of what they have contributed to and sacrificed for the marriage as well as their prospects for self-support following the separation. California law regards the duty to support one's spouse as an essential incident of marriage and refuses to confer the benefits of marriage on those who would avoid this obligation. Although numerous states have adopted the Uniform Premarital Agreement Act, California's position represents sounder public policy and should not be sacrificed to achieve uniformity."
In a letter to the Legislature on August 14, 1985, the Family Law Section of the State Bar of California echoed that concern. In opposing the proposed provision allowing premarital waivers of spousal support, the Family Law Section warned that such an enactment "would be a major change in California law" and "a great step backward in terms of assuring that the financial consequences of a dissolution of marriage are borne by both spouses in an equitable manner."
In sharp contrast to the thoughtful action by the Legislature, which after the letters quoted above deleted the proposed provision allowing premarital waivers of spousal support, the majority ignores the significant public policy considerations that prompted the Legislature to retain our existing law prohibiting such waivers.

III
After repudiating the existing law of this state prohibiting all premarital waivers of spousal support, the majority abdicates its responsibility to articulate guidelines for the bench and bar explaining when, if ever, such waivers are enforceable. The majority declares that it will not decide "whether all such agreements [premarital agreements waiving spousal support] are enforceable regardless of the circumstances of the parties at the time enforcement is sought" (maj. opn., ante, 99 Cal.Rptr.2d at pp. 279-280, 5 P.3d at pp. 840-841) and that it will not decide "whether circumstances existing at the time enforcement of a waiver of spousal support is sought might make enforcement unjust" (id. at p. 289, 5 P.3d at p. 848, fn. omitted).
Given the majority's "holding" that such provisions may or may not be enforceable depending upon circumstances the majority refuses to discuss, what guidance is there for attorneys preparing a premarital agreement to decide whether to include a waiver of spousal support? And what guidance is there for trial courts in determining the enforceability of such agreements? If enforcement of a premarital waiver of spousal support results in a spouse's becoming eligible for public assistance, should the trial court order spousal support limited to the amount necessary to avoid such eligibility, as provided for in the Uniform Premarital Agreement Act? (See ante, 99 Cal.Rptr.2d at p. 280, fn. 2, 5 P.3d at p. 841, fn. 2.) Or should the trial court in that instance continue to apply the considerations the Legislature has specified in Family Code section 4320? (See ante, at p. 281, fn. 3, 5 P.3d at p. 841, fn. 3) The majority's silence on these important questions does a disservice to the public, the bar, and the bench.
I would reverse the judgment of the Court of Appeal.
NOTES
[1] The right to spousal support is statutory. Family Code section 4330, subdivision (a), provides: "In a judgment of dissolution of marriage or legal separation of the parties, the court may order a party to pay for the support of the other party an amount, for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances as provided in Chapter 2 (commencing with Section 4320)."

Unless otherwise indicated all statutory references herein are to the Family Code.
[2] The order explained: "Assuming arguendo that the validity and enforceability of the waiver of spousal support provision of the parties' prenuptial agreement can be tested in a motion to strike, the court denied this motion on the ground that a waiver of spousal support in a premarital agreement is void and unenforceable as against California public policy. The court is persuaded that the legislative history of the statute dealing with the permissible subjects of premarital agreements indicated that the Legislature intended to omit a provision in the California version of the Uniform Premarital Agreement Act (UPAA) that allowed for a premarital waiver of spousal support.

"The court is further persuaded that the pre-UPAA cases that hold that premarital agreements that diminish or waive a party's obligation to pay spousal support to the other party to the marriage are unenforceable as against public policy and would continue to be so held after the passage of the UPAA.
"At least one purpose of a policy that a spousal support waiver will be unenforceable in this state is to protect the state, not just a party to the marriage. A person's financial circumstances can change markedly from those found just prior to that person's marriage. A valid premarital spousal support waiver could produce spouses who at the time of their marriage have assets and earning capacity to support themselves without spousal support, but by the time of the dissolution of their marriages may be unable to support themselves and in need of financial support. The state has an interest in having such needy spouses supported by their spouses if possible. Just as the state has a serious fiscal interest in not paying for support of children if there is a parent with the capacity to support that parent's children, the state has a fiscal interest in seeing that it not be forced to support needy former spouses if the non-needy former spouse is able to contribute to the support of the needy former spouse and if ordering the payment of such support is warranted, pursuant to the principles of Family Code § 4320. Thus the same principles and policies that underlie the public policy against permitting a binding waiver of child support would apply to premarital waivers of spousal support."
[3] The California version of the Uniform Act was enacted in 1985 as Civil Code section 5300 et seq., which was repealed in 1992, effective January 1, 1994, and reenacted as part of the new Family Code section 1600 et seq. (Fam.Code, § 1601.) The California version of section 3 of the Uniform Act is now Family Code section 1612. (Stats.1992, ch. 162, § 3, p. 464; id., § 10, p. 500.)
[4] Section 1615: "(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following:

"(1) That party did not execute the agreement voluntarily.
"(2) The agreement was unconscionable when it was executed and, before execution of the agreement, all of the following applied to that party:
"(A) That party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party.
"(B) That party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided.
"(C) That party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.
"(b) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law."
[5] Dawley also observed that use of the term "facilitate" in past cases describing unenforceable premarital agreements was misleading, since any such agreement could be said to facilitate dissolution by making a dissolution proceeding shorter and less expensive. Speaking in the context of a property agreement, we said that "public policy does not render property agreements unenforceable merely because such agreements simplify the division of marital property: it is only when the agreement encourages or promotes dissolution that it offends the public policy to foster and protect marriage." (Dawley, supra, 17 Cal.3d at p. 350, fn. 5, 131 Cal.Rptr. 3, 551 P.2d 323.)
[6] Candace asks the court to take judicial notice of copies of: (1) a letter dated August 14, 1985, to Assemblyman Lloyd G. Connelly, from the Family Law Section of the State Bar of California opposing the inclusion in Senate Bill 1143 of authorization for premarital waivers of spousal support; (2) a June 6, 1985, letter to the same effect to Senator Robert Beverly; (3) various sections of the New Jersey version of the Uniform Premarital Agreement Act (N.J. Stat. Ann. § 37:2-31 et seq.); and (4) former section 159 of the Civil Code, as originally enacted in 1872 and repealed in 1969 (replaced by Civ.Code, former § 4802; see now Fam.Code, §§ 1620, 3580).

The first two items, although bearing a Legislative Intent Service stamp, are not certified copies and it is not apparent that either was considered by the Legislature when Senate Bill 1143 was considered. There is no basis for an assumption that such letters reflect legislative intent. Judicial notice may be taken of the law of another state. (Evid.Code, § 452, subd. (a).) However, that law was not enacted until 1988 and thus is not relevant to legislative intent in this state. We therefore deny the request for judicial notice.
The position of the Women Lawyers' Association of Los Angeles was made clear to the Legislature in the subcommittee report discussed herein which quoted parts of it. That report listed the Family Law Section of the State Bar as a supporter of Senate Bill 1143, a position that later changed, as reflected in the referenced letter. The request for judicial notice of former section 159 of the Civil Code is granted.
[7] The Oregon court was itself quoting Adams v. Adams (1878) 25 Minn. 72, 79.
[8] At that time, the court was empowered to award support to a wife to whom a divorce was granted and could also award maintenance even if the divorce was denied. (Civ. Code, former §§ 136, 139, both enacted 1872 and repealed by Stats. 1969, ch. 1608, § 3, p. 3313.)
[9] Arizona (Ariz.Rev.Stat. § 25-203); Arkansas (Ark.Code Ann. § 9-11-403); Connecticut (Conn.Gen.Stat.Ann. § 46b-36d); Delaware (Del.Code Ann. tit. 13, § 323), District of Columbia (D.C.Code Ann. § 30-143 (1981)); Hawaii (Haw.Rev.Stat. § 572 D-3); Idaho (Idaho Code § 32-923); Illinois (750 Ill. Comp. Stat. 10/4); Kansas (Kans.Stat.Ann. § 23-804); Maine (Me.Rev.Stat.Ann.tit.19-A, § 604); Montana (Mont.Code Ann. § 40-2-605); Nebraska (Neb.Rev.Stat. § 42-1004); Nevada (Nev.Rev.Stat. § 123A.050); New Jersey (N.J.Stat.Ann. § 37:2-34); North Carolina (N.C. Gen. Stat. § 52B-4); North Dakota (N.D. Cent.Code § 14-03.1-03); Oregon (Or. Rev.Stat. § 108.710); Rhode Island (R.I. Gen. Laws § 15-17-3); Texas (Tex. Fam.Code Ann. § 4.003); Utah (Utah Code Ann. § 30-8-4); and Virginia (Va.Code Ann. § 20-150). An Indiana statute is similar to the Uniform Act. (Ind.Code§ 31-11-3-5.)
[10] New York (N.Y. Dom. Rel. Law § 236, pt. B, 3).
[11] Alabama (Ex parte Walters (Ala.1991) 580 So.2d 1352, 1354 [enforceable if "`[1] ... the consideration was adequate and ... the entire transaction was fair, just and equitable from the other person's point of view, or [2] ... the agreement was freely and voluntarily entered into by the other party with competent independent advice and full knowledge of her interest in the estate and its approximate value'"]); Alaska (Brooks v. Brooks (Alaska 1987) 733 P.2d 1044, 1050-1051 ["prenuptial agreements legally procured and ostensibly fair in result are valid and can be enforced"] ); Colorado (Newman v. Newman (Colo.1982) 653 P.2d 728, 731-734 [parties have fiduciary relationship and must act in good faith with high degree of fairness and disclosure of all material circumstances]); Florida (Snedaker v. Snedaker (Fla.Dist.Ct. App.1995) 660 So.2d 1070, 1072 [agreement must be fair and reasonable; not necessary to demonstrate disclosure or knowledge of extent of property] ); Georgia (Scherer v. Scherer (1982) 249 Ga. 635, 640-641 [292 S.E.2d 662] [not enforceable if unconscionable, procured through fraud, duress or mistake, or nondisclosure of material facts, or changed circumstances make enforcement unfair and unreasonable]); Kentucky (Edwardson v. Edwardson (Ky.1990) 798 S.W.2d 941, 946 [full disclosure required and will not be enforced if unconscionable at time enforcement sought]); Louisiana (McAlpine v. McAlpine (La. 1996) 679 So.2d 85, 93 [Civil Code provisions applicable to contracts generally apply] ); Maryland (Frey v. Frey (1984) 298 Md. 552 [471 A.2d 705] [enforceable if fair and equitable in procurement and result, with full disclosure of assets and entered into voluntarily with full knowledge of meaning and effect]); Minnesota (Hill v. Hill (Minn.Ct. App.1984) 356 N.W.2d 49, 55 [court will review for unconscionability at time enforcement sought]); Missouri (Gould v. Rafaeli (Mo.Ct.App.1991) 822 S.W.2d 494, 497 [enforceable if "`entered into freely, fairly, knowingly, understandingly and in good faith and with full disclosure'"] ); New Hampshire (MacFarlane v. Rich (1989) 132 N.H. 608, 613-614 [567 A.2d 585, 588] [enforceable if not obtained through fraud, duress, mistake, misrepresentation or nondisclosure of material fact, if not unconscionable, and circumstances have not changed]); Ohio (Gross v. Gross (1984) 11 Ohio St.3d 99, 105 [464 N.E.2d 500, 506] [enforceable if entered into freely without fraud, duress, coercion or overreaching, with full disclosure or knowledge and understanding of the party's property, and if terms do not promote or encourage divorce]); Oklahoma (Hudson v. Hudson (Okla.1960) 350 P.2d 596); Pennsylvania (Simeone v. Simeone (1990) 525 Pa. 392 [581 A.2d 162] [enforceable if just and reasonable] ); South Carolina (Gilley v. Gilley (1997) 327 S.C. 8 [488 S.E.2d 310, 312]); Tennessee (Cary v. Cory (Tenn.1996) 937 S.W.2d 777 [enforceable if entered into freely and knowledgeably, with disclosure, absent undue influence or overreaching, but not if spouse will become public charge]); West Virginia (Gant v. Gant (1985) 174 W.Va. 740 [329 S.E.2d 106, 112 [agreement must be entered into voluntarily and knowledgeably]); and Wisconsin (Hengel v. Hengel (1985) 122 Wis.2d 737, 365 N.W.2d 16). South Dakota, like California, has adopted the Uniform Act without section 3, subdivision (a)(4) and section 6, subdivision (b), and case law does not permit enforcement. (S.D. Codified Laws §§ 25-2-18, 25-2-24; Connolly v. Connolly (S.D. 1978) 270 N.W.2d 44, 46).
[12] The Legislature may, of course, limit the right to enter into premarital waivers of spousal support and/or specify the circumstances in which enforcement should be denied.
[*] Hon. J. Gary Hastings, Associate Justice, Court of Appeal, Second District, Division 4, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] Section 3 of the Uniform Premarital Agreement Act provides: "(a) Parties to a premarital agreement may contract with respect to: [¶] (1) the rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located; [¶] (2) the right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property; [¶] (3) the disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event; [¶] (4) the modification or elimination of spousal support; [¶] (5) the making of a will, trust, or other arrangement to carry out the provisions of the agreement; [¶] (6) the ownership rights in and disposition of the death benefit from a life insurance policy; [¶] (7) the choice of law governing the construction of the agreement; and [¶] (8) any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty. [¶] (b) The right of a child to support may not be adversely affected by a premarital agreement." (9B West's U. Laws Ann., supra, at p. 373, italics added.)
[2] Section 6, subdivision (b) of the Uniform Premarital Agreement Act states: "If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility." (9B West's U. Laws Ann., supra, at p. 376.)
[3] The issues I address here are not presented in In re Marriage of Bonds (2000) 24 Cal.4th 1, 99 Cal.Rptr.2d 252, 5 P.3d 815 (Bonds), a unanimous decision of this court filed simultaneously with this decision, although both concern premarital agreements and both require interpretation of the Uniform Premarital Agreement Act. The main issue in Bonds is whether one spouse voluntarily entered into the premarital agreement, an issue not presented here. Also, the focus of the dispute in Bonds appears to be the premarital waiver of community property rights, not spousal support. This distinction is crucial because the Legislature, when it enacted the Uniform Premarital Agreement Act, deliberately omitted the provision authorizing spousal support waivers while approving and enacting the provision authorizing waivers of community property rights.

The Legislature's decision to permit waiver of community property rights, but not spousal support, may be explained on policy grounds. A spouse who has waived community property rights, but not spousal support, retains effective protection against a sudden, drastic, and inequitable loss of income resulting from dissolution of marriage, and may have recourse either to former community property or to separate property to enforce a spousal support order (Fam.Code, § 4338). By contrast, a spouse who has lost the right to spousal support may well have no recourse except public assistance. Thus, the inequities that may result from premarital spousal support waivers are much graver than those that may result from a premarital waiver of community property rights.
[4] Family Code section 4320 provides: "[¶] In ordering spousal support under this part, the court shall consider all of the following circumstances: [¶] (a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following: [¶] (1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment. [¶] (2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties. [¶] (b) The extent to which the supported party contributed to the attainment of an education, training, a Career position, or a license by the supporting party. [¶] (c) The ability to pay of the supporting party, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living. [¶] (d) The needs of each party based on the standard of living established during the marriage. [¶] (e) The obligations and assets, including the separate property, of each party. [¶] (f) The duration of the marriage, [¶] (g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party. [¶] (h) The age and health of the parties.... [¶] (i) The immediate and specific tax consequences to each party. [¶] (j) The balance of the hardships to each party. [¶] (k) The goal that the supported party shall be self-supporting within a reasonable period of time.... [A] `reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section ... and the circumstances of the parties. [¶] (l) Any other factors the court determines are just and equitable."

Section 4320 applies to spousal support upon legal separation or dissolution of the marriage. (Fam.Code, § 4330, subd. (a).)