Filed 5/27/16  Marriage of Nunez and Minar CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Marriage of EDWARD A. NUNEZ and MARY L. MINAR. | |
| EDWARD ALLEN NUNEZ,  Appellant,  v.  MARY LORENE MINAR,  Respondent. | G051412  (Super. Ct. No. 10D009231)  O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Carla M. Singer, Judge.  Affirmed in part, reversed in part, and remanded with directions.

John L. Dodd & Associates, John L. Dodd, Andrea M. Jackson; and Warren Chao for Appellant.

The Law Office of Patrick A. McCall and Patrick A. McCall for Respondent.

\*          \*          \*

Edward Nunez appeals from a judgment of dissolution awarding the family residence to his now ex-wife, Mary Minar, as her sole and separate property. The court also denied Edward's request for spousal support and attorney fees.[1]

Mary owned the residence prior to the marriage. Shortly after the parties were married, Mary deeded the residence to Edward as his sole and separate property for the purpose of refinancing the home at a better interest rate. Mary's understanding was that Edward would deed the property back to her as her sole and separate property after the refinancing. That did not happen, however. Edward ultimately added Mary back onto title, but as a joint tenant. The court held this transaction unfairly benefited Edward, raising a presumption of undue influence that he failed to rebut. We affirm that portion of the judgment.

In denying spousal support and attorney fees, the court declined to apply each of the factors mandated by Family Code section 4320, holding generally there was insufficient evidence to establish the marital standard of living.[2] This was error. Consideration of each section 4320 factor is mandatory, and there was sufficient evidence for the court to perform that analysis. With regard to attorney fees, the court also held Edward's counsel's declaration was too vague to assess whether the time spent was reasonable. This was also error, as there was sufficient, albeit not ideal, evidence on that front. We remand to the trial court to perform the proper statutory analysis as to both spousal support and attorney fees.

---

[1] We use first names for clarity, intending no disrespect.

[2] All statutory references are to the Family Code unless otherwise stated.

FACTS

Mary met Edward in 2000. She was living in a house in Huntington Beach that she owned in her name only. Mary had previously been married, and pursuant to her prior divorce proceeding she had purchased her prior spouse's interest in the house. She took out a second mortgage on the house to do so. The parties began living together, part time, sometime in the 2001-2002 timeframe. In 2002, after Mary's divorce was completed, Edward was contributing to Mary's monthly expenses. Also in this time frame, Mary filed for bankruptcy. Edward moved in with Mary full time in 2004. In December 2004, foreclosure proceedings were initiated on the house. Edward employed a specialist in loans and bankruptcies named Donna Kaye Chapman (Chapman), who helped stave off the foreclosure. In 2004, Mary borrowed $30,000 from Edward to help pay the mortgage. Mary executed a deed of trust on the home in favor of Edward in the amount of $30,000. When Mary repaid the loan, Edward reconveyed the deed of trust.

The parties were married in January 2006. Edward gave Mary a wedding ring worth $40,000.

Five weeks after their marriage, Mary signed a deed granting title to the house to Edward, which has now become the focus of the parties' dispute. The purpose of the deed was to refinance the home. The interest rate on the home was high, and Mary's prior bankruptcy prevented her from obtaining a better rate. Edward had "perfect credit," and thus the home was refinanced in his name only.

Regarding the refinancing, Mary testified she understood the plan to be that Edward would deed the house back to her as her sole and separate property.

"Q And what was the understanding, if anything, after the refinance in fact took place; would you be placed back on title? What was your understanding?

"A It was my understanding the – yes, the house would be mine again, as it had been for 15 years prior.

"Q As your sole and separate property?

"A Correct.

"Q Was there ever an understanding that [Edward] would continue to have some joint ownership in this property?

"A No."

"Q Now, after May of 2006, you now have secured the financing that you both had desired. [¶] Did you still have an understanding that you would be placed back on title as your sole and separate property?

"A Absolutely.

"Q How many [discussions] approximately did you have up through 2008, if any, with respect to this issue?" Mary replied there were approximately five discussions.

Mary testified that Chapman was a witness to a conversation the parties had about the refinancing. Chapman testified she acted as a mortgage broker for the parties. She advised them she could not get a better interest rate with Mary on title, but she could get a better rate if only Edward was on title. Chapman testified that she was asked if Mary could be placed back on title after the refinancing, to which she replied, "I could not be a part of that, nor could the title company that I worked for be a part of that, but that absolutely, after the loan was closed, that [Mary] could be added back to title." After both parties had questioned Chapman, the court inquired of Chapman whether her understanding was that Mary would be placed back on title as her sole and separate property, or as a joint tenant. Chapman replied she did not know, but that her opinion, which she discussed with the parties, was that "this was a normal transaction between a husband and a wife that [she had] seen on numerous occasions, and that the home was their home, and that they were both trying to do the best for their joint financial situation and their improvement and their home, and it didn't strike me as being peculiar because I have handled a lot of situations where unfortunately one person or the other has had a

4

hiccup in their credit, and they trust each other.  And I clarified that both parties trusted each other.  I mean, there was trust involved on both sides, and I just believed it was a normal husband-and-wife-type situation."

The payoff amount on the existing loan was approximately $301,000.  As part of the refinancing, in addition to paying off the loan previously in Mary's name, Edward obtained approximately $50,000 cash.  Of that $50,000, $30,000 was given to Edward to pay back the prior $30,000 loan.  The remaining $20,000 in cash was "used for vacations and put into the marriage."  With closing costs, the total amount of the new loan was $367,000.  The prior loan had been an adjustable rate mortgage with an interest rate over 10 percent and climbing.  The new loan had an interest rate of approximately 5.625 percent.  As a result, the monthly payment was cut in half.  The parties stipulated that the value of the home as of February 2006 was $785,000, and at the time of trial the value was $715,000.

After the parties were married, the mortgage was paid with funds that were commingled.  The parties were a "basically married couple with all [their] funds pooled together."  During the marriage the parties improved the house by adding a pool, to which both contributed funds.

In May 2008 Edward reconveyed the house to himself and Mary as joint tenants.  His understanding was that this was the intent of the parties all along.  He testified that they were about to refinance the house and he felt it was a good time to put her back on title.

Mary is a family physician with her own practice.  Mary grosses $10,000 per month from her practice, plus occasional bonuses.  During the marriage, for nine months, Edward helped with billing for the practice, for which he was paid $2,000 per month.  When the parties were married, the value of the business was $270,000.  When the parties separated, the value of the business was $330,000.  Mary offered an expert

5

who opined that, pursuant to the analysis required by *Pereira v. Pereira* (1909) 156 Cal. 1, the community had no interest in the business.

Edward worked for Home Depot as a human resources manager from 2002-2008, making approximately $90,000 per year.  He was laid off in 2008.  Aside from helping at Mary's business, he had no other employment, and as of the time of trial was unemployed.  He testified to various steps he had taken to find employment.  Since the parties separated, Edward had been living off of his retirement savings and "large sums of money" his parents gave him.

The parties separated in September 2010.  Edward petitioned for dissolution of the marriage in October 2010.

After trial, the court ruled the residence was Mary's sole and separate property.  The court reasoned:  "The residence . . . was acquired by [Mary] approximately 17 years before the parties' marriage.  Sometime before 2006 [Edward] loaned [Mary] $30,000.00.  Said loan was secured by a deed of trust on [Mary's] . . . residence.  Then, on January 13, 2006, [Mary] married [Edward].  Noting that [Mary] still owed [Edward] $30,000, the parties agreed that [Mary] would refinance her . . . residence so as to pay off [Edward].  In addition, interest rates had significantly reduced by 2006.  It was understood that in order to obtain a cash out loan it would be best for [Edward] to go on title instead of [Mary] so as to take advantage of the lowest interest rate possible.  Evidence established that before [Mary] executed a deed in favor of [Edward] it was specifically discussed and understood between the parties that [Mary] would deed the property to [Edward] for the sole purpose of placing new financing and after the refinancing was concluded [Edward] would transfer title back to [Mary].

"The Court finds that when the February 26, 2006 [deed] was executed by [Mary], [Edward] obtained an unfair advantage.  [Edward] had the burden of proof to establish that there was no undue influence.  In this matter [Edward] did not present any evidence that the February 26, 2006 transaction was not done by undue influence.  He

6

presented no competent evidence rebutting the presumption.  As a result of this transaction [Edward] received an advantage over [Mary].  When [Edward] failed to return title as agreed this was constructive fraud [see, *In re Marriage of Starr*, 189 Cal.App.4th 277 and *In re Marriage of Fossum* (2011) 192 Cal.App.4th 336.]  He had the burden to overcome the presumption of unfair advantage by establishing that [Mary]'s signing of the quitclaim deed was freely and voluntarily made, with full knowledge of all the facts, and with a completed understanding of its effect.  As such, the Court finds in favor of [Mary] and finds that the . . . residence is her separate property."

The court also denied Edward any spousal support:  "I must tell you, my studying on all of the issues that we have hereto for [*sic*] addressed sort of precluded a serious look on the question of spousal support.  However, my recollection is consistent with [Mary's counsel's] representation in his closing argument that there was really no evidence to support the [Family Code section] 4320 factors that the court must use in order to make an award with respect to spousal support.  And I did note in [Mary's counsel's] reply brief the argument that on a short-term marriage, the time to have made an award was presumably two years ago since the two-year presumed length of spousal support would be over by now.  I think what you're saying, and correct me if I'm wrong, you're way more familiar with this case than I am . . . .  I think what you're saying, so if there was no O.S.C. regarding spousal support, there should be no spousal support, and it should not be retroactive."  Mary's counsel then clarified that he was *not* making that argument.  The court then asked Edward's counsel to recite the evidence that would support the section 4320 factors.  Edward's counsel noted there was evidence of Edward's earning capacity, marketable skills given his age, and job prospects.  Counsel also cited Edward's efforts in building up Mary's business, as well as Mary's income and consequent ability to pay support.

7

Notwithstanding counsel's recitation, and the court's own acknowledgment that it needed to enunciate and evaluate the section 4320 factors, the court declined to do so.

"Well, I think the problem, too, is that – and this is where the law, it seems to me, has evolved since my last tour of duty in family law about 15 years ago – this is not a court of equity when it comes to spousal support.  The law is very clear that the court needs to determine the — help me, Mr. McCall [Mary's counsel].

"Mr. McCall:  The martial standard of living

"The Court:  Thank you.  [¶] — The martial standard of living.  The court can only make that determination based on the evidence.  [¶]  The court needs to determine and respond to and enunciate the 4320 factors in making an award of spousal support.  When the court is left with little or no evidence on those factors, the court can't just stand up and say, well, it's just not fair if he doesn't get spousal support.  After all, he's not getting the ring, he's not getting the house, and he's not getting the business.  Neither of the income and expense declarations, which were filed shortly before trial, . . . were admitted into evidence.  [¶]  Based on the evidence that I heard, other than knowing the house was [Mary's] home for 19 years and where she raised her children, I wouldn't have anything that I can remember from the record that would enable the court to come to a conclusion as to the marital standard of living, other than knowing that [Mary's] practice in medicine was located in Fountain Valley, and the house was located in Huntington Beach, I don't know that I had any facts before me to help me enunciate the 4320 factors."

"So I think I've heard you both on the question of spousal support, and the request for spousal support is denied."

The court also denied Edward's request for attorney's fees.  The court found Edward's counsel's declaration was insufficiently detailed to permit the court to assess the reasonableness of the fees:  "Well, I have to make a determination if fees were

8

reasonable, and I simply can't do that without an un-redacted billing that would help me determine what it cost for every action." The court also found it could not assess the section 4320 factors to determine whether an award of fees to Edward would be appropriate. Accordingly, it ordered the parties bear their own fees.

The court also ruled that Mary's business was entirely her separate property, and that the ring was Mary's sole and separate property. Edward timely appealed.

## DISCUSSION

Edward contends the court erred in three ways: in applying the wrong burden of proof regarding disposition of the house, in failing to enunciate the section 4320 factors in denying spousal support, and in denying his request for attorney fees. We affirm the court's disposition of the property, but reverse the court's order denying spousal support and attorney fees.

*The House*

There were two bases upon which the court awarded the house to Mary: that the transaction deeding the house to Edward represented an unfair advantage to him, and he failed to rebut the resulting presumption of undue influence; and Edward's failure to reconvey the home to Mary as her sole and separate property violated an agreement the parties had prior to the transaction. Because we agree Edward was unduly advantaged and failed to rebut the presumption of undue influence, we need not address whether Edward violated an agreement to reconvey the property.

"'Appellate review of a trial court's finding that a particular item is separate or community property is limited to a determination of whether any substantial evidence supports the finding.'" (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734.)

9

However, where "the basic 'inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values,' the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law," which we review independently. (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 184.)

We first address the correct burden and standard of proof. There are conflicting presumptions that potentially apply in cases such as this. The first is the presumption of title which states, "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." (Evid. Code, § 662.) However, this presumption may give way, in transactions between spouses, to the presumption of undue influence, "because spouses occupy confidential relations with each other, when an interspousal transaction advantages one spouse over the other, a presumption of undue influence arises." (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 287.) "[W]here there is a conflict between the common law presumption in favor of title as codified in [Evidence Code] section 662 and the presumption that a husband and wife must deal fairly with each other, application of [Evidence Code] section 662 is improper." (*Ibid.*)

Here we must decide whether a presumption of undue influence attaches to Mary's transfer of the residence to Edward, and, if so, whether it was rebutted. "Generally, a spouse obtains an advantage if that spouse's position is improved, he or she obtains a favorable opportunity, or otherwise gains, benefits, or profits." (*In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 629.) Edward argues there was no unfair advantage because he ultimately obtained a 50 percent interest in the home but, "[b]ecause [Edward] also assumed the liability for the mortgage, he did not 'profit' in this context. Certainly, there was nothing 'unfair' about the transaction because [Mary] could not refinance on her own." There is some facial appeal to this argument. After all, under the "intent of the lender" rule, the proceeds of the loan were Edward's separate property which he used to pay down Mary's loans, which amounted to close to 50 percent of the

10

value of the home. (See *In re Marriage of Neal* (1984) 153 Cal.App.3d 117, 125, disapproved of on other grounds by *In re Marriage of Buol* (1985) 39 Cal.3d 751, 763 & fn. 10 ["the security for the loan pursuant to a first deed of trust . . . was [the wife's] separate property, and 'funds procured by the hypothecation of separate property of a spouse are separate property of that spouse'"]; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2015) ¶ 8:275, p. 8-104.)

Edward's argument, however, obscures the real substance of the transaction. Edward did not contribute $367,000 of his own independent funds to the residence. Rather, he obtained a quite valuable residence for no consideration whatsoever, then hypothecated that residence to obtain a loan that was so much lower than the actual value of the home that he was never in any significant danger of suffering loss on the loan. The only real contribution Edward made to the transaction was to impair his own credit. While that is something, there was no evidence that it was worth 50 percent of the equity in the home (which, given the over $400,000 in equity in the home, amounted to over $200,000). Accordingly, Edward received an unfair advantage from the transaction and thus the presumption of undue influence applied.[3]

To rebut the presumption, Edward needed to show, by a preponderance of the evidence, the transaction "was freely and voluntarily made, with a full knowledge of all the facts and with a complete understanding of the effect . . . ." (*In re Marriage of Mathews*, *supra*, 133 Cal.App.4th at p. 630.) The trial court concluded he had not done so, and substantial evidence supports that conclusion. Mary testified that her understanding was that the house would be returned to her as her sole and separate property. Crediting that testimony, plainly she did not enter into the transaction with the

---

[3] The parties dispute whether we should characterize Edward's gain from the transaction as 100 percent of the equity in the home, since he initially took title as his sole and separate property, or 50 percent of the equity in the home, since he ultimately put Mary back on title as a joint tenant. Since we conclude he obtained an unfair advantage under either scenario, we need not resolve that dispute.

11

understanding that Edward would own 50 percent of the house. And while Chapman, the loan broker, testified that her opinion was that the house was *theirs* and this was a normal husband-wife transaction, she could not say whether the parties understood whether Mary would be added back onto title as her sole and separate property or as a joint tenant. Given the ambiguity in Chapman's testimony, it did not require, as a matter of law, the court to find the presumption had been rebutted. Thus there was no error in awarding the house to Mary as her sole and separate property.

In the alternative, Edward contends the court erred by failing to reimburse him for the community's contributions to paying down the mortgage and capital improvements, such as the addition of a $75,000 pool paid for by community funds. (See generally *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426; *In re Marriage of Moore* (1980) 28 Cal.3d 366; *In re Marriage of Sherman* (2005) 133 Cal.App.4th 795, 800 ["Courts have applied this so-called *Moore /Marsden* rule not only where the parties use community funds to pay down a mortgage, but also where they use community funds to make improvements to a residence purchased by one of the parties before marriage and those improvements increase the property's equity value"].) The problem with this argument, as Mary points out, is that, *at trial*, Edward never asked the court to order reimbursement. He placed all his proverbial eggs in the basket of being a 50 percent owner of the home. After losing at trial, Edward filed a motion for new trial in which, for the first time, he sought a new trial to determine his rights of reimbursement. Edward has not presented any authority, however, requiring the trial court to grant a new trial to determine a right that was not sought at the initial trial.

Edward's response is that he did raise the issue at trial, and he points to two places in the record, but we find neither was adequate to raise the issue at trial. First, he points to his closing argument brief, where he argued that *Mary* was *not* entitled to reimbursement. Second, he points to his oral closing argument where he made the same contention. But, plainly, arguing Mary was not entitled to reimbursement is a far cry

12

from affirmatively seeking a remedy of reimbursement for himself. There was no error in failing to provide a remedy that Edward did not ask for.

*Spousal Support*

Edward contends the court erred in denying spousal support because the court did not separately analyze each factor under section 4320 and instead held there was insufficient evidence for the court to even analyze the issue. We agree the court erred.

Section 4320 provides, "In ordering spousal support under this part, the court shall consider all of the following circumstances . . . ." It then lists 16 circumstances the court *shall* consider.[4] "In ordering spousal support, the trial court *must*

---

[4] "(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following:
"(1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment.
"(2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties.
"(b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party.
"(c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living.
"(d) The needs of each party based on the standard of living established during the marriage.
"(e) The obligations and assets, including the separate property, of each party.
"(f) The duration of the marriage.
"(g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party.
"(h) The age and health of the parties.
"(i) Documented evidence, including a plea of nolo contendere, of any history of domestic violence, as defined in Section 6211, between the parties or perpetrated by

13

consider and weigh all of the circumstances enumerated in the statute, to the extent they are relevant to the case before it." (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302.) "'"Furthermore, the court does not have discretion to ignore any relevant circumstance enumerated in the statute. To the contrary, the trial judge must both recognize and *apply* each applicable statutory factor in setting spousal support. [Citations.] Failure to do so is reversible error."'" (*In re Marriage of Geraci* (2006) 144 Cal.App.4th 1278, 1297.) If the court properly considers the statutory factors, it has broad discretion to deny spousal support or award it in any amount "that reflects the ability of both parties in contemporary unions to provide for their own needs." (*In re Marriage of Pendleton & Fireman* (2000) 24 Cal.4th 39, 52.) "'A trial court's exercise of discretion will not be disturbed on appeal unless, *as a matter of law,* an abuse of discretion is shown — i.e., where, considering all the relevant circumstances, the court has "exceeded the bounds of reason" or it can "fairly be said" that no judge would reasonably make the same order under the same circumstances.'" (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480.)

---

either party against either party's child, including, but not limited to, consideration of emotional distress resulting from domestic violence perpetrated against the supported party by the supporting party, and consideration of any history of violence against the supporting party by the supported party.

"(j) The immediate and specific tax consequences to each party.

"(k) The balance of the hardships to each party.

"(*l*) The goal that the supported party shall be self-supporting within a reasonable period of time. Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties.

"(m) The criminal conviction of an abusive spouse shall be considered in making a reduction or elimination of a spousal support award in accordance with Section 4324.5 or 4325.

"(n) Any other factors the court determines are just and equitable." (§ 4320.)

Here, the court recognized it had a duty to enumerate the section 4320 factors, but it declined to do so on the ground that there was insufficient evidence to establish the marital standard of living. We agree the evidence was not as robust as it could have been, but it was not so paltry as to excuse the court from performing the mandatory statutory analysis. There was evidence of both Mary's and Edward's earning capacity and marketable skills. There was evidence of efforts Edward had made to find a job. There was evidence that at least a portion of Edward's unemployment was due to performing work to assist with Mary's business. There was evidence of family vacations, an expensive wedding ring, and a valuable home. There was evidence of the age and health of the parties. All of this evidence was relevant to multiple section 4320 factors. On remand, Edward is entitled to a decision based upon the required statutory analysis. Nothing about this opinion should be construed as limiting the court's discretion about whether to award spousal support, and, if so, in what amount.

*Attorney Fees*

The court denied Edward attorney fees on two grounds: the first, which we already concluded was error above, was the court's perceived inability to perform a section 4320 analysis; the second was that the attorney's description of his time spent on this case was too vague to determine if it was reasonable. The latter ground was also error.

Section 2030 provides: "(a)(1) In a proceeding for dissolution of marriage . . . the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party . . . whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding. [¶] (2) When a request for attorney's fees and costs is made, the court shall make findings on

15

whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs."

Section 2032 provides: "(a) The court may make an award of attorney's fees and costs under Section 2030 or 2031 where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties. [¶] (b) In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320."

A fee award must not only be just, but also reasonable. "The major factors to be considered by a court in fixing a reasonable attorney's fee [are]: 'the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience in the particular type of work demanded [citation]; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the cause, and the time consumed.'" (*In re Marriage of Cueva* (1978) 86 Cal.App.3d 290, 296.) A court's award of attorney fees is reviewed for abuse of discretion. (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 866 (*Keech*).) The failure to assess the reasonableness of the requested attorney fees constitutes an abuse of discretion. (*Id.* at p. 870.)

In support of the request for attorney fees, Edward's attorney submitted a declaration that contained the following:

16

"[Edward] employed my services in August 2012. I am a family law practitioner with over 20 years of legal experience. I am a graduate of Harvard University and New York University School of Law."

"From the time of my initial retainer with [Edward] and just prior to this hearing date I have spent over forty (80) [*sic*] hours on this matter — preparing filings, disclosures, meeting with my client, conducting and reviewing discovery, and preparing and attending trial over three days. I expect to spend another eight (8) hours at a hearing for request for orders regarding spousal support and attorneys fees, as well as the trial on July 22, 2014 and preparing a judgment."

"My hourly rate in this case is $300.00. I have billed the [Edward] total fees to date of $6,000.00." He ultimately requested a fee award of "at least $10,000 . . . ."

After trial, Edward's counsel submitted a supplemental declaration, stating, "Based on the trial dates of July 22 and July 23, 2014 and the preparation for and attendance at said trial, I have additional legal fees in this case as follows: ten hours attending court on both dates, and eight hours of pretrial preparation and interim trial preparation for a trial brief. I also expect another three hours of time on judgment and post judgment matters. The total number of additional hours is therefore 21 hours, and at my billing rate of $300/hr would total an additional $6,300."

In denying fees, the judgment states, "There was no competent evidence presented to the Court that demonstrates that the alleged fees incurred by [Edward] were reasonable in this matter. Other than [Edward's counsel's] conclusionary [*sic*] declaration, Mr. Chao simply failed to show any underlying proof of his requested claim, e.g., receipts, bills, attorney time records, etc." The court cited *Keech*, *supra*, 75 Cal.App.4th 860.

However, *Keech*, *supra*, 75 Cal.4th 860 does not require that an attorney submit billing records to justify a fee award. In *Keech* the trial court awarded fees to the

17

wife.  In reversing (*id*. at p. 871), the Court of Appeal noted, "Wife did not, however, submit her attorney's bills*, or any declaration by her counsel of the amount of time spent, the nature of the work done, or the rate charged*. Wife's only 'evidence' in this regard was her declaration that:  'By the most recent bill I received . . . I owe approximately $31,000 to [counsel]'" (*id.* at p. 864, italics added).  The basis of the reversal in *Keech* was that "the court made no inquiry into whether the fees were, in the words of section 2030, 'reasonably necessary.'"  (*Id.* at p. 869.)

"In California, an attorney need not submit contemporaneous time records in order to recover attorney fees . . . .  [Citation.]  Testimony of an attorney as to the number of hours worked on a particular case is sufficient evidence to support an award of attorney fees, even in the absence of detailed time records."  (*Martino v. Denevi* (1986) 182 Cal.App.3d 553, 559.)  Edward's counsel's declaration in this case was certainly not ideal.  His approach of lumping all the pretrial tasks together did not facilitate a thorough review, but the practice of block billing does not preclude a fee award.  It may, however, justify a downward adjustment.  (*Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 830 ["block billing is not objectionable 'per se,' though it certainly does increase the risk that the trial court, in a reasonable exercise of its discretion, will discount a fee request"].)

The court here made essentially the same error as the trial court in *Keech*: it never exercised its discretion to determine whether the fees incurred were reasonable. *At minimum*, the court was perfectly capable of deciding whether the time spent in trial was reasonable, and, given what the court knows about the complexity of the litigation (or lack thereof), the court can determine whether the claimed pretrial hours were reasonably spent as well.

Nothing about our disposition here, however, requires the court to award fees on remand, or, if it does so, requires any particular amount.  We hold only that the court is required to perform the analysis contemplated by sections 2030 and 2032.

18

DISPOSITION

The court's judgment denying spousal support and attorney fees is reversed and remanded to the trial court to perform the required statutory analysis as to spousal support and attorney fees. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

FYBEL, J.