Filed 5/8/26  Marriage of R.L. and T.L. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re the Marriage of R.L. and T.L. | |
| R.L., Respondent, v. T.L., Appellant. | A170564 (San Mateo County Super. Ct. No. 21FAM00978) |

Over a year before respondent R.L. filed this action to dissolve the parties' marriage, she and appellant T.L.[1] executed a mediated marital separation agreement (the MSA), which characterized a ranch property acquired during their marriage as R.L.'s separate property and included mutual waivers of spousal support in the event of their divorce.  Following a bifurcated trial, the trial court ruled that the MSA was valid (the MSA proceedings).

---

[1] Because this matter involves protected parties in domestic violence restraining order (DVRO) proceedings and children in proceedings under the Family Code, we refer to the parties by their first and last initials to protect their privacy and their children's privacy.  (Cal. Rules of Court, rule 8.90(b)(1).)

T.L. brings this interlocutory appeal from the judgment in the MSA proceedings. (Fam. Code, § 2025.)[2] He does not challenge the trial court's central finding that there was no undue influence in the MSA's execution, but claims both its characterization of the ranch and its waivers of spousal support are invalid.

We find no error in the trial court's ruling concerning the ranch. As for the spousal support waivers, we agree with T.L. that the evidence did not support the court's ruling that the MSA was either an agreement for "an immediate separation" or one executed after the parties had separated. (§ 3580.) We reverse the judgment in the MSA proceedings insofar as it validates the spousal support waivers, and remand for further proceedings in accord with this opinion.

## I. BACKGROUND[3]

R.L. and T.L. married in February 2000 and have three children. R.L. has an undergraduate degree and obtained a juris doctor and master of business administration during the marriage. She then worked in venture

---

[2] Undesignated statutory references are to the Family Code.

[3] We include in our recitation of the factual and procedural background a brief summary of the proceedings on the parties' respective domestic violence restraining order (DVRO) requests, as reflected in R.L.'s appendix filed on April 14, 2025. Whether or not those proceedings are properly construed as separate actions from this one (see *In re Marriage of Reichental* (2021) 73 Cal.App.5th 396, 404 [DVRO may be issued in a proceeding for dissolution of marriage or an independent action]), the appendix provides relevant context that is an appropriate subject of judicial notice. We consider it for that purpose alone. (Evid. Code, § 452, subd. (d); *Aixtron, Inc. v. Veeco Instruments Inc.* (2020) 52 Cal.App.5th 360, 382 [taking judicial notice of documents from related action as to their existence and a court ruling they reflect, and to provide "background information regarding the [parties'] dispute," but not as to the truth of factual statements therein], disapproved on another ground by *Vo v. Technology Credit Union* (2025) 108 Cal.App.5th 632, 647.)

capital and became a partner at a venture capital fund. T.L. has a bachelor's degree in mathematics and a master of business administration in finance. He worked full time until 2014, when the company that employed him was sold. He was employed full time for another company for under six months, ending in 2019, and then began to work on his own start-up company.

## A. The Spring of 2017

In March 2017, T.L. told R.L. he believed she was having an affair while she was on a trip to New York. After her return from the trip, R.L. and T.L. slept in separate bedrooms in the home they shared with their children in San Mateo County. One night, T.L. removed two guns from a gun safe in the closet of the main bedroom, where R.L. was asleep. He brought the guns to the kitchen and consumed two to three mixed whiskey drinks. R.L. came into the kitchen and asked T.L. what he was doing, and he said he was cleaning his guns. R.L. took ammunition for the guns and put it in the pocket of her bathrobe. T.L. admittedly said something "like[,] . . . 'Did you get them all?' "

In the DVRO proceedings that followed R.L.'s petition for dissolution, T.L. maintained he had merely been cleaning his guns that evening and did not intend to reload them that night. R.L. testified (and T.L. denied) that T.L. called her names while reading aloud from an email she sent him from New York, then pointed a gun at her, moved it slightly to the right of her face, and pulled the trigger—but there was no bullet in the chamber. R.L. called 911 and officers responded. T.L. was placed on a mental health hold pursuant to Welfare and Institutions Code section 5150. About 60 hours later, T.L. was released. He returned to the San Mateo residence.

As T.L. testified in the MSA proceedings, he and R.L. were in the process of purchasing a ranch elsewhere in California at the time of his

3

psychiatric hold. Within a week of his release, he signed a deed granting sole title of the ranch to R.L.[4] According to T.L., he did so at R.L.'s request. R.L. had expressed fear that if the parties divorced, an ongoing medical condition she suffered from "would flare up and she wouldn't be able to work anymore, and she would lose all of her savings to medical debt and she'd be homeless." T.L. suggested " 'put[ting] the ranch in the kids' names' " with a provision that R.L. could "live there no matter what." R.L. was "angry" at this suggestion and said, " 'How about we just put it in my name? By the way, I was given a choice to DV you and ruin your life.' " T.L. testified that R.L. also said, "she had the card of the detective[,] and she could call him at any time and have [T.L.] taken away." He signed the deed out of "[f]ear or terror" that R.L. might try to have him placed on another psychiatric hold.

Still, T.L. acknowledged that he proposed forming an LLC called True Love, LLC and suggested it could hold title to the ranch property for R.L. On the day he signed the deed granting the ranch to R.L., he emailed her ideas "to address [her] fears." His email acknowledged her fear that he would " 'want half of that [ranch] and lawyer up trying to pull fiduciary duty bullshit.' "

## B.    *The Parties Mediate Their Anticipated Divorce*

During the bifurcated MSA proceedings, the parties testified about the discussions that preceded their mediation. R.L. testified that it was her idea to engage in mediation, and T.L. agreed to it. She and T.L. consulted with a divorce mediator in September 2018, but they did not meet with that mediator again because "[T.L.] did not like him."

---

[4] We grant T.L.'s motion to augment the record to include the interspousal transfer grant deed he signed and the deed executed by the ranch's previous owners, which both grant the ranch to R.L. as her separate property.

4

In August 2019, the parties contacted another mediator. In the months that followed, they met with this mediator in person four or five times and exchanged over a hundred emails with her. R.L. testified that during this time, T.L. told her, "he was really excited about [his startup] and that it would be worth over a hundred million dollars[,] . . . far more money than [she] ever made." Meanwhile, her health issues had reached "a breaking point" and she had "dramatically reduced [her] work schedule." She "didn't know if [she] could keep working at that point."

In December 2019, T.L. executed documents stating that venture capital funds associated with R.L.'s job would be community property through August 12, 2019 (about when the parties began working with the second mediator) and would be R.L.'s individual property thereafter. These documents also stated that T.L. would waive spousal support in the event of divorce. T.L. testified that he prepared and executed these documents at R.L.'s request—which R.L. denied. Later that month, T.L. retained an attorney. During the same month, the parties traveled with their children to Australia.

In April 2020, the parties executed the MSA, which was drafted by the mediator they were working with. T.L. had provided feedback on multiple drafts of the agreement over the course of six weeks and had an opportunity for his attorney to review it. Consistent with the December 2019 documents, the MSA stated that the parties agreed their date of separation was August 12, 2019, although they planned to continue living together for a period of time and might "engage in activity that may not be consistent with having a date of separation under California law." The MSA referred to the parties' "ongoing marriage," while also reciting their "acknowledge[ment] that there

5

[was] no guarantee their marriage w[ould] continue and that there [was] a strong likelihood" either party would petition to dissolve it "in the future."

The ranch was listed on an exhibit to the MSA setting forth separate property of R.L.'s, along with her clothing and personal effects. T.L. waived his interest in the listed property "[e]xcept with reference to the Ranch," as to which he preserved a "claim for reimbursement for community funds that may have been expended in connection with any Ranch expenses, including property taxes and maintenance and improvement." The MSA also established "a streamlined process" by which the parties would continue dividing and transmuting their assets, which T.L. estimated were worth about $20 million at that time. The MSA included mutual waivers of spousal support, conditioned upon a comprehensive divorce agreement "that resolves all issues, including child custody, to the Parties' mutual satisfaction." The waivers provided that "if there is a contested proceeding regarding custody . . ., resulting in a court order for custody over a parent's objection, then" the waivers "shall be of no further force and effect."

R.L. testified that at the time the parties began to negotiate the MSA, she "believed [they] were separated" and "were living as roommates and coparents." She wanted mediation "to formalize a lot of the agreements [she and T.L.] had come to" and "to make sure that if [she] . . . was able to and chose to continue to work," her effort would benefit "[her]self and the children." She also wanted "privacy" and to avoid litigation and excessive attorney fees. She understood that T.L. "had a lot of the same goals" and likewise "did not at all want to pay lawyers." In addition, "he did not want to have to get a job" and wanted R.L. "to kind of get off his back about that." Still, R.L. acknowledged that at the time the parties negotiated the MSA— between the time they engaged the second mediator and the time they

6

executed the agreement—she "wasn't sure" that her marriage was over or that the parties' differences were irreconcilable. As for T.L., "it depended [on] which day of the week you asked" him whether he wanted a divorce or to reconcile.

T.L. testified that R.L. had characterized the MSA as "a postnuptial agreement" and did not tell him their marriage was over. He went to mediation "to forestall" R.L.'s "ang[er]." He did not want to go to mediation and wanted to go to marriage counseling instead.

After they signed the MSA, the parties continued to live with their children in their San Mateo home and to use a joint bank account. T.L. continued to prepare their taxes. From the latter half of 2020 until the summer of 2021, they relocated to another state with their children so the children could attend school in person during the COVID pandemic.

In the spring of 2021, the parties told their children they were getting divorced and the children "responded, 'Yes, that's what we thought.' " Beginning in May of that year, R.L. and T.L. executed a series of agreements dividing their assets as contemplated by the MSA. The first detailed their plans to move back to California, explaining that T.L. would purchase a home that would become his separate property and would reside there upon their return. R.L. would return to the San Mateo residence, which would become her separate property. The community funds to purchase T.L.'s residence and the community property equity in the San Mateo residence would be "accounted for and equalized" in a future agreement or agreements.

## C.     R.L. Files for Divorce and Obtains a Restraining Order

R.L. filed this action to dissolve the parties' marriage in June 2021, alleging that she and T.L. separated on August 12, 2019, as recited in the MSA. In his responsive filing, T.L. stated that the date of separation was

"TBD." In February 2022, the parties stipulated to equally divide 75 percent of their shares in a particular company, which were worth a total of about $28 million.

In March 2022, R.L. filed a request for a DVRO protecting herself and the parties' children. The trial court issued a temporary restraining order, then entered a stipulated order removing the children as protected parties. T.L. then filed his own request for a DVRO protecting himself from R.L. The proceedings on the DVRO requests were consolidated, and the court heard evidence over several days beginning in December 2022. The court granted R.L.'s request for a DVRO and denied T.L.'s.

## D.    *Bifurcated Proceedings on the Validity of the MSA*

Meanwhile, the parties agreed to bifurcate the issue of the MSA's validity from the rest of the dissolution proceedings. In connection with that issue, T.L. claimed the entire MSA was invalid due to "[R.L.]'s undue influence/breach of fiduciary duties," explaining that R.L. "was abusive and controlled [him]" throughout their relationship as detailed in his DVRO request. T.L. maintained that the date of separation recited in the MSA was not accurate, his waiver of spousal support was not valid, and the characterization of the ranch as R.L.'s separate property was unenforceable. On the day trial began, he filed a supplemental trial brief arguing the spousal support waiver was invalid because it was executed while the parties were married and "before they . . . separated." The trial court noted this brief "was not timely," but confirmed it understood "those are arguments that [T.L.] want[ed] to make . . . as to the illegality of the MSA."

Trial in the MSA proceedings was held in August and September 2023. R.L. and T.L. were the only witnesses. In the midst of trial, T.L. requested a statement of decision concerning whether his waiver of spousal support was

8

valid, whether the date of separation set forth in the MSA was accurate, and related issues. Just before the last day of trial, T.L. filed an "addendum" to his supplemental trial brief, offering additional argument to support his claim that the parties were not separated when they signed the MSA, along with a supporting declaration. The trial court struck these documents as untimely filed but allowed T.L. to present any evidence they addressed during the final day of trial.

After hearing the evidence, the trial court issued a tentative ruling finding the MSA was valid and rejecting T.L.'s challenges to its specific provisions. The tentative ruling directed T.L. to file another request for a statement of decision in accordance with rule 3.1590 of the California Rules of Court if he wished. T.L. filed such a request, which we address below.

The trial court issued its final statement of decision in February 2024. The court found that the MSA was valid. It found no presumption of undue influence applied since the MSA was a mediated agreement. The court "recognize[d]" T.L.'s arguments that the "earlier deed transfer" concerning the ranch was invalid, but found this issue was "moot in light of the subsequent [MSA]." The MSA was "unambiguous and effectuated a clear award" of the ranch to R.L. The court observed that the MSA was negotiated "approximately three years after" T.L.'s psychiatric hold, "attenuating any suggestion of undue influence as a result of that event." Both parties were intelligent and educated, and T.L. had "showed off his understanding of the parties' financials . . . during his testimony."

As to the spousal support waiver, the trial court found that the MSA was a separation agreement, in which support waivers are authorized per section 3580. It rejected T.L.'s argument that the date of separation was inaccurate given that "the parties engaged in a protracted negotiation" of the

9

MSA from 2018 to 2022. The court found that invalidating the MSA "on the grounds that the date of separation [the parties] mediated and agreed upon was inaccurate" would be "an extreme result given that [R.L.] did proceed to file a dissolution within a reasonable amount of time after the agreement was mediated and executed." "Moreover, the fact that the agreement was mediated suggests that there was no coercion," there did "not appear to have been any intent to limit the spouses' duties to support each other during marriage," and thus, "the facts presented do not invoke the public policy concerns" embodied in the Family Code. The court credited R.L.'s testimony about "the time and effort that went into mediating this agreement over the course of eight months[,]" including "considerations of her health concerns and [T.L.'s] job prospects." The court declined to make a finding as to the specific date on which the parties separated because "this issue was not before the Court, and the Court finds it unnecessary to determine in deciding the validity of the [MSA]."

In April 2024, the trial court entered judgment in the MSA proceedings, reserving jurisdiction over other pending issues. T.L. filed a request that the trial court certify its ruling for immediate appeal, which the court granted over R.L.'s opposition. We granted T.L.'s subsequent motion for leave to appeal, which was unopposed.

## II. DISCUSSION

T.L. contends that the trial court prejudicially erred by validating his waiver of spousal support and awarding the ranch to R.L. as her separate property. He asks us to invalidate the entire MSA or, alternatively, to invalidate each of the challenged provisions and hold that the MSA "does not waive" his claim to an "equalizing payment or reimbursement for his community property interest in the ranch."

10

T.L. has forfeited any claim that the entire MSA is invalid by failing to explain or support this assertion in his appellate briefing.  (See *Coziahr v. Otay Water Dist.* (2024) 103 Cal.App.5th 785, 799 ["[p]oints must be supported by reasoned argument, authority, and record citations, or may be deemed forfeited"].)  We address his challenges to its specific provisions in turn.

## A.    *Legal Background*

Spouses who are divorcing commonly execute marital settlement agreements to "provide[], among other things, for a division of community assets and debts, and for child and spousal support." (*In re Marriage of Lynn* (2002) 101 Cal.App.4th 120, 129–130 (*Lynn*).)  "[T]he Family Code does not expressly define" a marital settlement agreement, but "several of its provisions contemplate their existence."  (*Id.* at p. 129.)

Public policy generally favors settlement to resolve legal disputes, and " '[t]his is especially true in marital dissolution litigation where it is so clearly in the financial and emotional interests of the parties, especially where they have children, to reach an expeditious and final resolution of their dispute.' " (*In re Marriage of Norton* (1988) 206 Cal.App.3d 53, 58.)  Consistent with this policy, California courts have long held that marital " ' "[p]roperty settlement agreements occupy a favored position in the law of this state . . . ." ' "  (*In re Marriage of Woolsey* (2013) 220 Cal.App.4th 881, 897 (*Woolsey*), quoting *Adams v. Adams* (1947) 29 Cal.2d 621, 624 (*Adams*).)  "[T]he law respects the finality of a property settlement agreement 'that is not tainted by fraud or compulsion or is not in violation of the confidential relationship of the parties.' "  (*Mejia v. Reed* (2003) 31 Cal.4th 657, 669, quoting *Adams* at p. 624.)  When divorcing spouses agree to a division of property, "no law requires them to divide the property equally, and the court does not

11

scrutinize [a marital settlement agreement] to ensure that it sets out an equal division." (*Mejia v. Reed, supra,* 31 Cal.4th at p. 666.)

Agreements about support have been viewed somewhat differently but often constitute an important or integral part of a marital settlement. (See *Sprenger v. Superior Court* (1969) 268 Cal.App.2d 857, 867.) "Spouses who are separated have long been permitted" to include in a contract for division of property "provisions for spousal support on dissolution, even when community property was evenly divided and thus the division was not consideration for the modification of spousal support rights." (*In re Marriage of Pendleton and Fireman* (2000) 24 Cal.4th 39, 52 (*Pendleton*).) A party to such an agreement "may waive the right to receive spousal support." (*Lynn, supra,* 101 Cal.App.4th at p. 130.)

Property and support agreements are addressed by separate Family Code sections, which provide that spouses "can contract with each other *at any time* regarding property and, in a written agreement to [an immediate separation], may provide for child and spousal support during separation or upon dissolution of marriage. (§§1620, 3580.)" (*Litke O'Farrell, LLC v. Tipton* (2012) 204 Cal.App.4th 1178, 1183; *Pendleton, supra,* 24 Cal.4th at p. 52.) In this context, an "immediate" separation means "an instantaneous, present act, without delay, or without any time intervening," in other words, "an actual present fact, . . . something which has been completed and not an event to take place in the future." (*Brown v. Brown* (1927) 83 Cal.App. 74, 82 (*Brown*) [discussing predecessor statute].) While the issue has not been revisited recently, our Supreme Court has held that spousal support waivers executed during an ongoing marriage are unenforceable. (See *Pereira v. Pereira* (1909) 156 Cal. 1, 4.)

12

**B.** *Characterization of the Ranch as R.L.'s Separate Property*

T.L. claims the trial court erred in finding that regardless of the validity of his transfer of the ranch to R.L. in 2017, the MSA unambiguously awarded it to her as her separate property. We find no error in the court's ruling.

As an initial matter, the parties dispute whether, as T.L. contends, an award of the ranch to R.L. must have satisfied the requirements of section 852 concerning transmutations of marital property or whether, as R.L. contends, section 2550 governing marital settlement agreements trumps these requirements. We need not resolve this dispute because the MSA satisfied the requirements of section 852. We review this issue de novo. (*In re Marriage of Bonvino* (2015) 241 Cal.App.4th 1411, 1422 [" '[i]n deciding whether a transmutation has occurred, we interpret the written instruments independently, without resort to extrinsic evidence,' " and are not bound by the trial court's interpretation].)

Section 852, subdivision (a) provides: "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." The MSA sets forth the parties' agreement that property described on Exhibit B—which includes the ranch—is "[R.L.]'s sole and separate property in conformance with Family Code Section 852." As we will explain, this was a valid transmutation: a declaration that property is a spouse's separate property in conformance with

13

the statute governing transmutations is an "express declaration" that satisfies the statute.[5]  (§ 852, subd. (a).)

T.L. seems to argue such a declaration is ineffective where one or both parties believed the subject property was already appropriately characterized as the transmutation declares.  He relies primarily on *Estate of MacDonald* (1990) 51 Cal.3d 262 (*MacDonald*), which held that a decedent wife's consent to her husband's designation of a trust as the beneficiary of certain accounts did not satisfy the "express declaration" requirement of section 852's predecessor statute.  *MacDonald* reasoned that the consent included "no language which characterize[d] the property assertedly being transmuted" or "expressly stating that [the] decedent was effecting a change in the character or ownership of her interest" therein.  (*Id.* at pp. 272–273.)  The consent merely provided, " 'Being the participant's spouse, I hereby consent to the above [beneficiary] designation.' "  (*Id.* at p. 265, fn. 2.)

*MacDonald* concluded that an " 'express declaration' " must contain language "which expressly states that the *characterization* or *ownership* of the property is being changed."  (*Id.* at p. 272, italics added.)  But it emphasized that an " 'express declaration' " might, but "need not" actually contain "the words 'transmutation,' 'community property,' or 'separate property,' " or "any other particular locution."  (*Id.* at p. 273.)  *MacDonald* then gave an example that controls the analysis here: "For example, the paragraph . . . here would have been sufficient if it had included an additional sentence reading: 'I give to the account holder *any interest* I have in the funds deposited in this account.' "  (*Ibid.*, italics added.)  Contrary to

---

[5] The parties do not cite, and we have not located in our own research, any authority addressing whether comparable language specifically referencing section 852 satisfies the statute.

T.L.'s argument, the *MacDonald* example does not specifically characterize the wife's prior interest in the funds—it generally states that she gives "any interest" she might have to the account holder, her husband.

Here, going beyond what is required by *MacDonald*, the MSA specifically characterizes the ranch as R.L.'s "separate property" and states that it has that character "in conformance with Family Code Section 852," the statute governing transmutations. This is analogous to the grant of " 'any interest' " in the *MacDonald* example.

We reject the proposition that a transmutation cannot be effective as to a property one or both parties believed was already properly characterized in the manner declared. As *MacDonald* explained, the Legislature imposed the " 'express declaration' " requirement to eliminate "reliance on extrinsic evidence for the proof of transmutations" accomplished through oral statements or by implication from the parties' conduct, including writings like the *MacDonald* wife's consent to her husband's beneficiary designation. (*MacDonald*, *supra,* 51 Cal.3d at pp. 268–270, 273.) In holding that not just any writing could satisfy the requirement of an " 'express declaration,' " *MacDonald* analogized to a similar statute that required an "express declaration" to create a joint tenancy. (*Id.* at pp. 271–272.) That statute required the operative document to "declare the interest being transferred 'to be a joint tenancy.' " (*Ibid.*) Again, that is what the MSA does here: it declares the ranch to be R.L.'s separate property in conformance with the statute governing transmutations.

Neither section 852 or the *MacDonald* opinion requires that the parties believed a property previously had a different character in order for a transmutation to be effective. Such a requirement would make it impossible for spouses to "express[ly] declar[e]" the status of property whose prior

15

characterization was unclear or disputed, an absurd reading of a statute intended to require that transmutations be self-contained so that extrinsic evidence need not be considered to interpret them. We decline to impose such a requirement. As *MacDonald* explained, it is enough for spouses to expressly declare their intent to transmute any interest they may have in a property, using any words that make that intent clear. We find that a statement that property is one spouse's separate property "in conformance with" the transmutation statute is clear enough.

T.L. additionally claims that undue influence in the parties' initial characterization of the ranch in 2017 tainted their characterization of the property in the MSA years later. He cites no authority to support that proposition. In any case, the trial court found that the events of 2017 did not impact the execution of the MSA on the facts presented here. T.L. expressly does not challenge the court's ruling that there was no undue influence in the execution of the MSA. He also fails to acknowledge that the court specifically found the passage of "approximately three years" from the time of T.L.'s psychiatric hold to the time the parties executed the MSA "attenuat[ed] any suggestion of undue influence" as to the characterization of the ranch. "[S]ubstantial evidence supports the trial court's conclusion that any presumption of undue influence" concerning the ranch "was rebutted" by the passage of time and the other circumstances surrounding the execution of the MSA. (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 740.)

Finally, T.L. complains that the trial court failed to address the meaning of language in the MSA preserving his right to reimbursement associated with the ranch to some degree. But this issue was beyond the scope of the trial on the MSA's validity. Consistent with this conclusion, T.L. did not address the reimbursement issue in his trial briefs or seek a ruling on

16

it in either of his requests for a statement of decision.  The issue is not properly before us at this time.

## C.	*Spousal Support Waiver*

T.L. correctly argues, and R.L. does not dispute, that a spousal support waiver executed during an ongoing marriage is invalid unless it is part of an agreement "to an immediate separation."  (§ 3580.)  In T.L.'s view, the trial court not only declined to rule on the parties' exact date of separation but likewise failed to rule on the ultimate issue of whether "the parties' separation was either already in effect or in any sense 'immediate' at the time they reached agreement on the [MSA]."

As we will explain, we must infer the trial court made this ruling in R.L.'s favor.  Still, to do so, the court had to have discredited unequivocal statements in the MSA as well as R.L.'s own testimony that she "wasn't sure" the parties' marriage was over when the parties negotiated the MSA.  Finding no rational basis for the court to have disregarded this evidence, we must reverse.

### 1.	*Doctrine of Implied Findings*

" 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' "  (*Kaushansky v. Stonecroft Attorneys, APC* (2025) 109 Cal.App.5th 788, 799, quoting *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)  This generally includes a presumption that the court presiding over a bench trial " 'impliedly made every factual finding necessary to support its decision.' "  (*Kaushansky, supra*, 109 Cal.App.5th at p. 799.)  To avoid this inference, a party must "request a statement of decision as to specific issues to obtain an explanation of the trial court's tentative decision ([Code Civ. Proc.,] § 632)" and then bring claimed defects in the statement of

17

decision "to the trial court's attention to avoid implied findings on appeal favorable to the judgment ([*id.,*] § 634)." (*Arceneaux, supra*, 51 Cal.3d at p. 1134; see Cal. Rules of Court, rule 3.1590.)

Here, as the trial court directed, T.L. raised asserted defects with the court's tentative ruling through a renewed request for a statement of decision. He asked the court to rule on the date of separation and "explain and reconsider the factual and legal basis for its tentative conclusion that the spousal support waiver was valid." The court expressly declined to issue a ruling on the date of separation, so we do not presume it found the date recited in the MSA was valid. (See *Reid v. Moskovitz* (1989) 208 Cal.App.3d 29, 32 ["when a trial court expressly refuses to make a finding" an appellate court will not presume it did].)

However, "[a] court's statement of decision need not respond to every point raised by a party or make an express finding of fact on each contested factual matter; it need only dispose of all basic issues and fairly disclose the court's determination as to ultimate facts and material issues in the case." (*Duarte Nursery, Inc. v. California Grape Rootstock Improvement Com.* (2015) 239 Cal.App.4th 1000, 1012.) "In this context, 'the term "ultimate fact" generally refers to a core fact, such as an essential element of a claim.' " (*Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1171 (*Slone*).) The court is not required to make findings on " 'detailed evidentiary facts' " (*ibid.*) or immaterial issues (*Vukovich v. Radulovich* (1991) 235 Cal.App.3d 281, 295).

Here, the trial court ruled that it was "unnecessary to determine" the date of separation to decide whether the MSA was valid and simultaneously found "[t]he facts provided in connection with this hearing establish this agreement to be a mediated separation agreement, and the law authorizes

18

spousal support waivers for such an agreement. (See Fam. Code § 3580.)"
The court was correct that a ruling on a particular date of separation was
unnecessary to determine the material issue in dispute here: whether the
MSA was a separation agreement governed by section 3580. The court found
it was, and by implication found the MSA was either an agreement "for
immediate separation" or one "for support entered into after a separation has
taken place." (*Kamper v. Waldon* (1941) 17 Cal.2d 718, 721 [applying
predecessor statute to section 3580].)

Other than requesting a specific finding as to the date of separation,
T.L. in his renewed request for a statement of decision merely argued with
the trial court's conclusion that section 3580 applied rather than objecting
that necessary findings were lacking. T.L. did not, for example, ask the court
to clarify whether it found the parties had separated or had agreed to an
immediate separation, or request specific findings on the elements of
separation (§ 70, subd. (a) [one spouse "expressed to the other . . . the intent
to end the marriage" and the spouse's "conduct" was "consistent with [that]
intent"]). We apply the doctrine of implied findings to the court's conclusion.
(See *Slone, supra,* 106 Cal.App.5th at p. 1171 ["a party cannot avoid the
application of the doctrine of implied findings by asserting 'objections' which
merely disagree with the trial court's findings in its statement of decision"].)[6]

2.    *Substantial Evidence Review*

We review the trial court's implied findings on the issue of separation
for substantial evidence and apply our independent judgment to any related

---

[6] T.L. did ask the trial court to clarify whether it was finding that the
parties waived the requirements of section 70. The statement of decision
does not indicate that the court made any such finding, and we do not
presume that it did. In any case, R.L. has not raised such a waiver argument
on appeal.

issues of statutory interpretation. (See *In re Marriage of Lee & Lin* (2019) 41 Cal.App.5th 698, 702; *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94.)

"Substantial evidence is a deferential standard, but it is not toothless." (*In re I.C.* (2018) 4 Cal.5th 869, 892.) The standard requires " 'evidence which is reasonable, credible, and of solid value.' " (*Ibid.*) In reviewing a finding under this standard, " '[t]he ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record.' " (*Daugherty v. City and County of San Francisco* (2018) 24 Cal.App.5th 928, 945 (*Daugherty*), quoting *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 (*Kuhn*).)

"In the usual case, we must infer the trial court made any and all findings necessary to support an order" and defer to its credibility determinations. (*Shapell SoCal Rental Properties, LLC v. Chico's FAS, Inc.* (2022) 85 Cal.App.5th 198, 217–218 (*Shapell*).) "But we are not bound by credibility determinations that are arbitrary or unreasonable." (*Id.* at p. 218.) Thus, we may credit "[u]ncontradicted testimony rejected by the trial court" where, " ' "in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved." ' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) Likewise, " '[w]hile substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence." ' " (*Daugherty, supra,* 24 Cal.App.5th at p. 945.) " 'Reasonable' inferences do not include those which are contrary to uncontradicted evidence of such a nature that reasonable people would not doubt it." (*Kuhn, supra,* 22 Cal.App.4th at p. 1633, fn. 4.)

3. *Analysis*

While recent case authority on this point is lacking, R.L. does not contest that an "immediate" separation for purposes of section 3580 is one that is "an instant fact" and is "not an event to take place in the future." (*Brown, supra,* 83 Cal.App. at p. 82.) We agree with this interpretation of the statute's plain language. Like R.L., we focus our analysis on whether the parties had separated or were immediately separating at the time they executed the MSA.

Section 70 informs that question. It defines the date of separation as the date that "a complete and final break in the marital relationship has occurred," evidenced by both (1) a spouse's expression to the other spouse of "the intent to end the marriage" and (2) the spouse's conduct "consistent with the intent to end the marriage." (§ 70, subd. (a).) No single circumstance is dispositive: "the court shall take into consideration all relevant evidence." (§ 70, subd. (b).) Neither "the filing of a dissolution petition" nor "recitations in a marital settlement agreement" compel a finding that the parties are separated. (*In re Marriage of Hardin* (1995) 38 Cal.App.4th 448, 452 (*Hardin*).) The standard is not what " ' "society at large" ' " would think, but whether the elements of the statute are satisfied. (*Id.* at p. 450.) An assessment of the parties' intent and expression of the same is the key. (*In re Marriage of Lee & Lin, supra*, 41 Cal.App.5th at p. 701, citing *Hardin*.) " ' "The best evidence of this is their words and actions." ' " (*Ibid*.)

On a different record, we might infer the parties had separated from their execution of a series of agreements to govern their anticipated divorce and R.L.'s testimony that she "believed [they] were separated" and "were living as roommates and coparents" when they began to negotiate the MSA. But we must ask whether this is a reasonable deduction " 'based on the *whole*

21

record' " here. (*Daugherty, supra,* 24 Cal.App.5th at p. 945.) Our record includes the MSA itself, which repeatedly refers to the parties' "ongoing marriage" and expressly states there was merely "a strong likelihood" it might be dissolved at some indefinite point in the future. The MSA also includes the parties' acknowledgement that they were and might "in the future engage in activity that may not be consistent with having a date of separation under California law," for example, "they plan[ned] to continue to live together for a period of time." The record also contains R.L.'s own testimony that at the time the MSA was negotiated, she "wasn't sure" that her marriage was over or that the parties' differences were irreconcilable.[7] Notably, the record lacks any testimony by R.L. that she told T.L. their marriage was over—a requirement to find the parties had separated (§ 70, subd. (a)(1))—despite T.L.'s clear testimony that she did not. R.L. further testified that after the MSA was executed, the parties remained together in their San Mateo home and later relocated to another state together. T.L. continued to prepare their taxes, they maintained a joint banking account, and they did not tell their children they were divorcing until the spring of 2021.

On this record, it is too much of a stretch to infer R.L. intended "a complete and final break in the marital relationship" and communicated this to T.L. before or at the time they executed the MSA. (§ 70, subd. (a).) We

---

[7] This testimony was in response to a series of questions concerning the period between the parties' engagement of the second mediator and their execution of the MSA. While neither party clarified whether the testimony applied equally to the moment they signed the MSA, the other record evidence is consistent with the conclusion that it did, and nothing in the record suggests that R.L.'s intent, communications, or conduct concerning the marriage changed between the period that she negotiated the MSA and the moment she signed it.

generally defer to the trial court's credibility determinations, and must presume the court discredited portions of T.L.'s testimony. Still, it would be unreasonable for the court to have drawn these inferences from R.L.'s vague testimony that she "believed" she and T.L. were separated,[8] while disregarding her more specific testimony that she "wasn't sure" her marriage was over or that the parties' differences were irreconcilable, coupled with consistent statements in the MSA she signed her name to at the time. (See *Shapell, supra,* 85 Cal.App.5th at p. 218.) And R.L.'s own testimony about the parties' conduct after executing the MSA consistently weighs against a finding that the parties had separated.

Ultimately, the trial court concluded that invalidating the MSA "on the grounds that the date of separation [the parties] mediated and agreed upon was inaccurate" would be "an extreme result." While the court's view is understandable, it does not support a finding that the parties were separated or agreed to an immediate separation when they executed the MSA. The MSA reflects the parties' agreement that August 12, 2019, would serve as their date of separation for purposes of "streamlining and simplifying" their financial affairs and authorizing support waivers in the event their marriage did not continue in the future. But section 3580 does not authorize support waivers outside the context of an existing separation or an agreement to an "immediate separation." The whole record does not support a finding that either circumstance existed when the MSA was executed in April 2020. Without such proof, the support waivers are unenforceable under section 3580.

---

[8] Similar to this testimony, R.L. stated in a declaration supporting her request to bifurcate the MSA proceedings that "[i]n 2019 our marriage became irretrievably broken and it was clear our marriage was over." R.L. did not claim that she *told* T.L. their marriage was over in 2019.

## 4. *Remaining Issues*

R.L. argues that even if the spousal support waiver is invalid, T.L. has failed to show a miscarriage of justice resulting from the trial court's contrary ruling because he has not established a reasonable probability that spousal support would have been awarded to him absent the waiver. (See *Linton v. DeSoto Cab Co., Inc.* (2017) 15 Cal.App.5th 1208, 1224 [appealing party has the burden to affirmatively demonstrate prejudice: " ' "that it is reasonably probable that a result more favorable to [that] party would have been reached in the absence of the error" ' "].) We disagree. While R.L. offers arguments against an award of spousal support to T.L., none are dispositive, and the trial court did not consider them. (See *Malaga County Water Dist. v. Central Valley Regional Water Quality Control Bd.* (2020) 58 Cal.App.5th 418, 446 [trial court's error "resulted in a limited analysis that did not fully resolve the issues" and "trial court should have the first opportunity to resolve" factual issues that might arise in a full analysis]; *Linton, supra,* 15 Cal.App.5th at pp. 1224–1225 [holding the same].)

We shall reverse the judgment only as to the finding that the MSA's spousal support waivers are valid and direct the trial court to enter a new judgment invalidating those waivers[9] while finding that the MSA is otherwise valid. (See *Kaushansky v. Stonecroft Attorneys, APC, supra,* 109 Cal.App.5th at pp. 803–805 [such direction is appropriate following reversal for lack of substantial evidence where party had a full and fair opportunity to litigate his or her claim].)

---

[9] Given this ruling, we need not address T.L.'s argument that there was "insufficient consideration" for the spousal support waiver because it is tied to the parties' goal that issues concerning custody of their children be determined by their mutual agreement.

## III. DISPOSITION

The judgment in the MSA proceedings is reversed as to the finding that the MSA's spousal support waivers are valid, and is otherwise affirmed. The trial court shall enter a new judgment invalidating the spousal support waivers while finding that the MSA is otherwise valid. The matter is remanded to the trial court for further proceedings not inconsistent with this opinion. In the interests of justice, the parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

_____

SMILEY, J.

WE CONCUR:


_____

HUMES, P. J.



_____

LANGHORNE WILSON, J.

*In re the Marriage of R.L. and T.L.* / (A170564)